# CITY OF RICHMOND *v.* J. A. CROSON CO.

No. 87–998.   Argued October 5, 1988—Decided January 23, 1989

470

472

474

*John Payton* argued the cause for appellant. With him on the briefs were *Mark S. Hersh, Drew St. J. Carneal, Michael L. Sarahan, Michael K. Jackson,* and *John H. Pickering.*

*Walter H. Ryland* argued the cause and filed a brief for appellee.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Maryland by *J. Joseph Curran, Jr.,* Attorney General, and *Charles O. Monk II,* Deputy Attorney General; for the State of Michigan by *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Brent E. Simmons,* Assistant Attorney General; for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, and *Suzanne M. Lynn, Marjorie Fujiki,* and *Marla Tepper,* Assistant Attorneys General, *John K. Van de Kamp,* Attorney General of California, *Joseph I. Lieberman,* Attorney General of Connecticut, *Frederick D. Cooke,* Corporation Counsel of the District of Columbia, *Neil F. Hartigan,* Attorney General of Illinois, *James M. Shannon,* Attorney General of Massachusetts, *Hubert H. Humphrey III,* Attorney General of Minnesota, *W. Cary Edwards,* Attorney General of New Jersey, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *Dave Frohnmayer,* Attorney General of Oregon, *James E. O'Neil,* Attorney General of Rhode Island, *T. Travis Medlock,* Attorney General of South Carolina, *Kenneth O. Eikenberry,* Attorney General of Washington, *Charles G. Brown,* Attorney Gen-

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III–B, and IV, an opinion with respect to Part II, in which THE CHIEF JUSTICE and JUSTICE WHITE join, and an opinion with respect to Parts III–A and V, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE KENNEDY join.

In this case, we confront once again the tension between the Fourteenth Amendment's guarantee of equal treatment to all citizens, and the use of race-based measures to amelio-

eral of West Virginia, *Donald Hanaway*, Attorney General of Wisconsin, and *Joseph B. Meyer*, Attorney General of Wyoming; for the Alpha Kappa Alpha Sorority et al. by *Eva Jefferson Paterson, Robert L. Harris, Judith Kurtz, William C. McNeill III*, and *Nathaniel Colley*; for the American Civil Liberties Union et al. by *Edward M. Chen, Steven R. Shapiro, John A. Powell*, and *John Hart Ely*; for the city of San Francisco, California, et al. by *Louise H. Renne* and *Burk E. Delventhal*; for the Lawyer's Committee for Civil Rights under Law et al. by *Stephen J. Pollak, James R. Bird, Paula A. Sweeney, Grover Hankins, Judith L. Lichtman, Conrad K. Harper, Stuart J. Land, Norman Redlich, William L. Robinson, Judith A. Winston*, and *Antonia Hernandez*; for the Maryland Legislative Black Caucus by *Koteles Alexander* and *Bernadette Gartrell*; for the Minority Business Enterprise Legal Defense and Education Fund, Inc., et al. by *Anthony W. Robinson, H. Russell Frisby, Jr.*, and *Andrew L. Sandler*; for the NAACP Legal Defense and Educational Fund, Inc., by *Julius L. Chambers, Charles Stephen Ralston, Ronald L. Ellis, Eric Schnapper, Napoleon B. Williams, Jr.*, and *Clyde E. Murphy*; and for the National League of Cities et al. by *Benna Ruth Solomon* and *David A. Strauss*.

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Clegg, Glen G. Nager*, and *David K. Flynn*; for the Anti-Defamation League of B'nai B'rith by *Robert A. Helman, Michele Odorizzi, Daniel M. Harris, Justin J. Finger, Jeffrey P. Sinensky*, and *Jill L. Kahn*; for Associated Specialty Contractors, Inc., by *John A. McGuinn* and *Gary L. Lieber*; for the Equal Employment Advisory Council by *Robert E. Williams* and *Douglas S. McDowell*; for the Mountain States Legal Foundation by *Constance E. Brooks*; for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley*; for the Southeastern Legal Foundation, Inc., by *G. Stephen Parker*; and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar*.

rate the effects of past discrimination on the opportunities enjoyed by members of minority groups in our society. In *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), we held that a congressional program requiring that 10% of certain federal construction grants be awarded to minority contractors did not violate the equal protection principles embodied in the Due Process Clause of the Fifth Amendment. Relying largely on our decision in *Fullilove*, some lower federal courts have applied a similar standard of review in assessing the constitutionality of state and local minority set-aside provisions under the Equal Protection Clause of the Fourteenth Amendment. See, *e. g.*, *South Florida Chapter, Associated General Contractors of America, Inc.* v. *Metropolitan Dade County*, 723 F. 2d 846 (CA11), cert. denied, 469 U. S. 871 (1984); *Ohio Contractors Assn.* v. *Keip*, 713 F. 2d 167 (CA6 1983). Since our decision two Terms ago in *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), the lower federal courts have attempted to apply its standards in evaluating the constitutionality of state and local programs which allocate a portion of public contracting opportunities exclusively to minority-owned businesses. See, *e. g.*, *Michigan Road Builders Assn., Inc.* v. *Milliken*, 834 F. 2d 583 (CA6 1987), appeal docketed, No. 87–1860; *Associated General Contractors of Cal.* v. *City and Cty. of San Francisco*, 813 F. 2d 922 (CA9 1987). We noted probable jurisdiction in this case to consider the applicability of our decision in *Wygant* to a minority set-aside program adopted by the city of Richmond, Virginia.

I

On April 11, 1983, the Richmond City Council adopted the Minority Business Utilization Plan (the Plan). The Plan required prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises (MBE's). Ordinance No. 83–69–59, codified in Richmond, Va., City Code, § 12–156(a) (1985). The 30% set-

aside did not apply to city contracts awarded to minority-owned prime contractors.  *Ibid.*

The Plan defined an MBE as "[a] business at least fifty-one (51) percent of which is owned and controlled . . . by minority group members."  § 12–23, p. 941.  "Minority group members" were defined as "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts."  *Ibid.*  There was no geographic limit to the Plan; an otherwise qualified MBE from anywhere in the United States could avail itself of the 30% set-aside.  The Plan declared that it was "remedial" in nature, and enacted "for the purpose of promoting wider participation by minority business enterprises in the construction of public projects." § 12–158(a).  The Plan expired on June 30, 1988, and was in effect for approximately five years.  *Ibid.*[1]

The Plan authorized the Director of the Department of General Services to promulgate rules which "shall allow waivers in those individual situations where a contractor can prove to the satisfaction of the director that the requirements herein cannot be achieved."  § 12–157.  To this end, the Director promulgated Contract Clauses, Minority Business Utilization Plan (Contract Clauses).  Paragraph D of these rules provided:

> "No partial or complete waiver of the foregoing [30% set-aside] requirement shall be granted by the city other than in exceptional circumstances.  To justify a waiver, it must be shown that every feasible attempt has been made to comply, and it must be demonstrated that sufficient, relevant, qualified Minority Business Enterprises . . . are unavailable or unwilling to participate in the

---

[1] The expiration of the ordinance has not rendered the controversy between the city and appellee moot.  There remains a live controversy between the parties over whether Richmond's refusal to award appellee a contract pursuant to the ordinance was unlawful and thus entitles appellee to damages.  See *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1, 8–9 (1978).

contract to enable meeting the 30% MBE goal." ¶ D,
Record, Exh. 24, p. 1; see *J. A. Croson Co.* v. *Richmond,* 779 F. 2d 181, 197 (CA4 1985) *(Croson I).*

The Director also promulgated "purchasing procedures"
to be followed in the letting of city contracts in accordance
with the Plan. *Id.,* at 194. Bidders on city construction
contracts were provided with a "Minority Business Utiliza-
tion Plan Commitment Form." Record, Exh. 24, p. 3.
Within 10 days of the opening of the bids, the lowest other-
wise responsive bidder was required to submit a commitment
form naming the MBE's to be used on the contract and the
percentage of the total contract price awarded to the minor-
ity firm or firms. The prime contractor's commitment form
or request for a waiver of the 30% set-aside was then
referred to the city Human Relations Commission (HRC).
The HRC verified that the MBE's named in the commitment
form were in fact minority owned, and then either approved
the commitment form or made a recommendation regarding
the prime contractor's request for a partial or complete
waiver of the 30% set-aside. *Croson I,* 779 F. 2d, at 196.
The Director of General Services made the final determina-
tion on compliance with the set-aside provisions or the pro-
priety of granting a waiver. *Ibid.* His discretion in this re-
gard appears to have been plenary. There was no direct
administrative appeal from the Director's denial of a waiver.
Once a contract had been awarded to another firm a bidder
denied an award for failure to comply with the MBE require-
ments had a general right of protest under Richmond pro-
curement policies. Richmond, Va., City Code, § 12–126(a)
(1985).

The Plan was adopted by the Richmond City Council after
a public hearing. App. 9–50. Seven members of the public
spoke to the merits of the ordinance: five were in opposition,
two in favor. Proponents of the set-aside provision relied on
a study which indicated that, while the general population of
Richmond was 50% black, only 0.67% of the city's prime con-

struction contracts had been awarded to minority businesses
in the 5-year period from 1978 to 1983. It was also estab-
lished that a variety of contractors' associations, whose rep-
resentatives appeared in opposition to the ordinance, had vir-
tually no minority businesses within their membership. See
Brief for Appellant 22 (chart listing minority membership of
six local construction industry associations). The city's legal
counsel indicated his view that the ordinance was constitu-
tional under this Court's decision in *Fullilove* v. *Klutznick*,
448 U. S. 448 (1980). App. 24. Councilperson Marsh, a
proponent of the ordinance, made the following statement:

> "There is some information, however, that I want to
> make sure that we put in the record. I have been prac-
> ticing law in this community since 1961, and I am famil-
> iar with the practices in the construction industry in this
> area, in the State, and around the nation. And I can say
> without equivocation, that the general conduct of the
> construction industry in this area, and the State, and
> around the nation, is one in which race discrimination
> and exclusion on the basis of race is widespread." *Id.*,
> at 41.

There was no direct evidence of race discrimination on the
part of the city in letting contracts or any evidence that the
city's prime contractors had discriminated against minority-
owned subcontractors. See *id.*, at 42 (statement of Council-
person Kemp) ("[The public witnesses] indicated that the mi-
nority contractors were just not available. There wasn't a
one that gave any indication that a minority contractor would
not have an opportunity, if he were available").

Opponents of the ordinance questioned both its wisdom and
its legality. They argued that a disparity between minor-
ities in the population of Richmond and the number of prime
contracts awarded to MBE's had little probative value in estab-
lishing discrimination in the construction industry. *Id.*, at
30 (statement of Councilperson Wake). Representatives of
various contractors' associations questioned whether there

were enough MBE's in the Richmond area to satisfy the 30% set-aside requirement. *Id.*, at 32 (statement of Mr. Beck); *id.*, at 33 (statement of Mr. Singer); *id.*, at 35–36 (statement of Mr. Murphy). Mr. Murphy noted that only 4.7% of all construction firms in the United States were minority owned and that 41% of these were located in California, New York, Illinois, Florida, and Hawaii. He predicted that the ordinance would thus lead to a windfall for the few minority firms in Richmond. *Ibid.* Councilperson Gillespie indicated his concern that many local labor jobs, held by both blacks and whites, would be lost because the ordinance put no geographic limit on the MBE's eligible for the 30% set-aside. *Id.*, at 44. Some of the representatives of the local contractors' organizations indicated that they did not discriminate on the basis of race and were in fact actively seeking out minority members. *Id.*, at 38 (statement of Mr. Shuman) ("The company I work for belonged to all these [contractors'] organizations. Nobody that I know of, black, Puerto Rican or any minority, has ever been turned down. They're actually sought after to join, to become part of us"); see also *id.*, at 20 (statement of Mr. Watts). Councilperson Gillespie expressed his concern about the legality of the Plan, and asked that a vote be delayed pending consultation with outside counsel. His suggestion was rejected, and the ordinance was enacted by a vote of six to two, with Councilperson Gillespie abstaining. *Id.*, at 49.

On September 6, 1983, the city of Richmond issued an invitation to bid on a project for the provision and installation of certain plumbing fixtures at the city jail. On September 30, 1983, Eugene Bonn, the regional manager of J. A. Croson Company (Croson), a mechanical plumbing and heating contractor, received the bid forms. The project involved the installation of stainless steel urinals and water closets in the city jail. Products of either of two manufacturers were specified, Acorn Engineering Company (Acorn) or Bradley Manufacturing Company (Bradley). Bonn determined that

to meet the 30% set-aside requirement, a minority contractor would have to supply the fixtures. The provision of the fixtures amounted to 75% of the total contract price.

On September 30, Bonn contacted five or six MBE's that were potential suppliers of the fixtures, after contacting three local and state agencies that maintained lists of MBE's. No MBE expressed interest in the project or tendered a quote. On October 12, 1983, the day the bids were due, Bonn again telephoned a group of MBE's. This time, Melvin Brown, president of Continental Metal Hose (Continental), a local MBE, indicated that he wished to participate in the project. Brown subsequently contacted two sources of the specified fixtures in order to obtain a price quotation. One supplier, Ferguson Plumbing Supply, which is not an MBE, had already made a quotation directly to Croson, and refused to quote the same fixtures to Continental. Brown also contacted an agent of Bradley, one of the two manufacturers of the specified fixtures. The agent was not familiar with Brown or Continental, and indicated that a credit check was required which would take at least 30 days to complete.

On October 13, 1983, the sealed bids were opened. Croson turned out to be the only bidder, with a bid of $126,530. Brown and Bonn met personally at the bid opening, and Brown informed Bonn that his difficulty in obtaining credit approval had hindered his submission of a bid.

By October 19, 1983, Croson had still not received a bid from Continental. On that date it submitted a request for a waiver of the 30% set-aside. Croson's waiver request indicated that Continental was "unqualified" and that the other MBE's contacted had been unresponsive or unable to quote. Upon learning of Croson's waiver request, Brown contacted an agent of Acorn, the other fixture manufacturer specified by the city. Based upon his discussions with Acorn, Brown subsequently submitted a bid on the fixtures to Croson. Continental's bid was $6,183.29 higher than the price Croson had included for the fixtures in its bid to the city. This

constituted a 7% increase over the market price for the fixtures. With added bonding and insurance, using Continental would have raised the cost of the project by $7,663.16. On the same day that Brown contacted Acorn, he also called city procurement officials and told them that Continental, an MBE, could supply the fixtures specified in the city jail contract. On November 2, 1983, the city denied Croson's waiver request, indicating that Croson had 10 days to submit an MBE Utilization Commitment Form, and warned that failure to do so could result in its bid being considered unresponsive.

Croson wrote the city on November 8, 1983. In the letter, Bonn indicated that Continental was not an authorized supplier for either Acorn or Bradley fixtures. He also noted that Acorn's quotation to Brown was subject to credit approval and in any case was substantially higher than any other quotation Croson had received. Finally, Bonn noted that Continental's bid had been submitted some 21 days after the prime bids were due. In a second letter, Croson laid out the additional costs that using Continental to supply the fixtures would entail, and asked that it be allowed to raise the overall contract price accordingly. The city denied both Croson's request for a waiver and its suggestion that the contract price be raised. The city informed Croson that it had decided to rebid the project. On December 9, 1983, counsel for Croson wrote the city asking for a review of the waiver denial. The city's attorney responded that the city had elected to rebid the project, and that there is no appeal of such a decision. Shortly thereafter Croson brought this action under 42 U. S. C. § 1983 in the Federal District Court for the Eastern District of Virginia, arguing that the Richmond ordinance was unconstitutional on its face and as applied in this case.

The District Court upheld the Plan in all respects. See Supplemental App. to Juris. Statement 112–232 (Supp. App.). In its original opinion, a divided panel of the Fourth Circuit

Court of Appeals affirmed. *Croson I*, 779 F. 2d. 181 (1985). Both courts applied a test derived from "the common concerns articulated by the various Supreme Court opinions" in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), and *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978). See *Croson I, supra,* at 188. Relying on the great deference which this Court accorded Congress' findings of past discrimination in *Fullilove*, the panel majority indicated its view that the same standard should be applied to the Richmond City Council, stating:

> "Unlike the review we make of a lower court decision, our task is not to determine if there was sufficient evidence to sustain the council majority's position in any traditional sense of weighing the evidence. Rather, it is to determine whether 'the legislative history . . . demonstrates that [the council] reasonably concluded that . . . private and governmental discrimination had contributed to the negligible percentage of public contracts awarded minority contractors.'" 779 F. 2d, at 190 (quoting *Fullilove, supra,* at 503 (Powell, J., concurring)).

The majority found that national findings of discrimination in the construction industry, when considered in conjunction with the statistical study concerning the awarding of prime contracts in Richmond, rendered the city council's conclusion that low minority participation in city contracts was due to past discrimination "reasonable." *Croson I*, 779 F. 2d, at 190, and n. 12. The panel opinion then turned to the second part of its "synthesized *Fullilove*" test, examining whether the racial quota was "narrowly tailored to the legislative goals of the Plan." *Id.*, at 190. First, the court upheld the 30% set-aside figure, by comparing it not to the number of MBE's in Richmond, but rather to the percentage of minority persons in the city's population. *Id.*, at 191. The panel held that to remedy the effects of past discrimination, "a set-aside program for a period of five years obviously must require more than a 0.67% set-aside to encourage minorities to enter

the contracting industry and to allow existing minority contractors to grow." *Ibid.* Thus, in the court's view the 30% figure was "reasonable in light of the undisputed fact that minorities constitute 50% of the population of Richmond." *Ibid.*

Croson sought certiorari from this Court. We granted the writ, vacated the opinion of the Court of Appeals, and remanded the case for further consideration in light of our intervening decision in *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986). See 478 U. S. 1016 (1986).

On remand, a divided panel of the Court of Appeals struck down the Richmond set-aside program as violating both prongs of strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *J. A. Croson Co.* v. *Richmond*, 822 F. 2d 1355 (CA4 1987) *(Croson II)*. The majority found that the "core" of this Court's holding in *Wygant* was that, "[t]o show that a plan is justified by a compelling governmental interest, a municipality that wishes to employ a racial preference cannot rest on broad-brush assumptions of historical discrimination." 822 F. 2d, at 1357. As the court read this requirement, "[f]indings of *societal* discrimination will not suffice; the findings must concern 'prior discrimination *by the government unit involved.*'" *Id.*, at 1358 (quoting *Wygant, supra*, at 274) (emphasis in original).

In this case, the debate at the city council meeting "revealed no record of prior discrimination by the city in awarding public contracts . . . ." *Croson II, supra*, at 1358. Moreover, the statistics comparing the minority population of Richmond to the percentage of *prime* contracts awarded to minority firms had little or no probative value in establishing prior discrimination in the relevant market, and actually suggested "more of a political than a remedial basis for the racial preference." 822 F. 2d, at 1359. The court concluded that, "[i]f this plan is supported by a compelling governmental interest, so is every other plan that has been enacted in the past or that will be enacted in the future." *Id.*, at 1360.

486

The Court of Appeals went on to hold that even if the city had demonstrated a compelling interest in the use of a race-based quota, the 30% set-aside was not narrowly tailored to accomplish a remedial purpose. The court found that the 30% figure was "chosen arbitrarily" and was not tied to the number of minority subcontractors in Richmond or to any other relevant number. *Ibid.* The dissenting judge argued that the majority had "misconstrue[d] and misapplie[d]" our decision in *Wygant*. 822 F. 2d, at 1362. We noted probable jurisdiction of the city's appeal, 484 U. S. 1058 (1988), and we now affirm the judgment.

## II

The parties and their supporting *amici* fight an initial battle over the scope of the city's power to adopt legislation designed to address the effects of past discrimination. Relying on our decision in *Wygant*, appellee argues that the city must limit any race-based remedial efforts to eradicating the effects of its own prior discrimination. This is essentially the position taken by the Court of Appeals below. Appellant argues that our decision in *Fullilove* is controlling, and that as a result the city of Richmond enjoys sweeping legislative power to define and attack the effects of prior discrimination in its local construction industry. We find that neither of these two rather stark alternatives can withstand analysis.

In *Fullilove*, we upheld the minority set-aside contained in § 103(f)(2) of the Public Works Employment Act of 1977, Pub. L. 95–28, 91 Stat. 116, 42 U. S. C. § 6701 *et seq.* (Act) against a challenge based on the equal protection component of the Due Process Clause. The Act authorized a $4 billion appropriation for federal grants to state and local governments for use in public works projects. The primary purpose of the Act was to give the national economy a quick boost in a recessionary period; funds had to be committed to state or local grantees by September 30, 1977. The Act also contained the following requirement: " 'Except to the extent the Secretary

determines otherwise, no grant shall be made under this Act
. . . unless the applicant gives satisfactory assurance to the
Secretary that at least 10 per centum of the amount of each
grant shall be expended for minority business enterprises.'"
*Fullilove*, 448 U. S., at 454 (quoting 91 Stat. 116, 42 U. S. C.
§ 6705(f)(2)). MBE's were defined as businesses effectively
controlled by "citizens of the United States who are Negroes,
Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."
*Ibid.*

The principal opinion in *Fullilove*, written by Chief Justice
Burger, did not employ "strict scrutiny" or any other tradi-
tional standard of equal protection review. The Chief Jus-
tice noted at the outset that although racial classifications call
for close examination, the Court was at the same time "bound
to approach [its] task with appropriate deference to the Con-
gress, a co-equal branch charged by the Constitution with the
power to 'provide for the . . . general Welfare of the United
States' and 'to enforce by appropriate legislation,' the equal
protection guarantees of the Fourteenth Amendment." 448
U. S., at 472. The principal opinion asked two questions:
first, were the objectives of the legislation within the power
of Congress? Second, was the limited use of racial and eth-
nic criteria a permissible means for Congress to carry out its
objectives within the constraints of the Due Process Clause?
*Id.*, at 473.

On the issue of congressional power, the Chief Justice
found that Congress' commerce power was sufficiently broad
to allow it to reach the practices of prime contractors on fed-
erally funded local construction projects. *Id.*, at 475–476.
Congress could mandate state and local government com-
pliance with the set-aside program under its § 5 power to
enforce the Fourteenth Amendment. *Id.*, at 476 (citing *Kat-
zenbach* v. *Morgan*, 384 U. S. 641, 651 (1966)).

The Chief Justice next turned to the constraints on Con-
gress' power to employ race-conscious remedial relief. His
opinion stressed two factors in upholding the MBE set-aside.

First was the unique remedial powers of Congress under § 5 of the Fourteenth Amendment:

> "Here we deal . . . not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that *in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress*, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees." 448 U. S., at 483 (principal opinion) (emphasis added).

Because of these unique powers, the Chief Justice concluded that "Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional antidiscrimination provisions, but also, where Congress has authority to *declare certain conduct unlawful*, it may, as here, authorize and induce state action to avoid such conduct." *Id.*, at 483–484 (emphasis added).

In reviewing the legislative history behind the Act, the principal opinion focused on the evidence before Congress that a nationwide history of past discrimination had reduced minority participation in federal construction grants. *Id.*, at 458–467. The Chief Justice also noted that Congress drew on its experience under § 8(a) of the Small Business Act of 1953, which had extended aid to minority businesses. *Id.*, at 463–467. The Chief Justice concluded that "Congress had abundant historical basis from which it could conclude that traditional procurement practices, when applied to minority businesses, could perpetuate the effects of prior discrimination." *Id.*, at 478.

The second factor emphasized by the principal opinion in *Fullilove* was the flexible nature of the 10% set-aside. Two "congressional assumptions" underlay the MBE program: first, that the effects of past discrimination had impaired the competitive position of minority businesses, and second, that "adjustment for the effects of past discrimination" would as-

sure that at least 10% of the funds from the federal grant program would flow to minority businesses. The Chief Justice noted that both of these "assumptions" could be "rebutted" by a grantee seeking a waiver of the 10% requirement. *Id.*, at 487–488. Thus a waiver could be sought where minority businesses were not available to fill the 10% requirement or, more importantly, where an MBE attempted "to exploit the remedial aspects of the program by charging an unreasonable price, *i. e.*, a price not attributable to the present effects of prior discrimination." *Id.*, at 488. The Chief Justice indicated that without this fine tuning to remedial purpose, the statute would not have "pass[ed] muster." *Id.*, at 487.

In his concurring opinion, Justice Powell relied on the legislative history adduced by the principal opinion in finding that "Congress reasonably concluded that private and governmental discrimination had contributed to the negligible percentage of public contracts awarded minority contractors." *Id.*, at 503. Justice Powell also found that the means chosen by Congress, particularly in light of the flexible waiver provisions, were "reasonably necessary" to address the problem identified. *Id.*, at 514–515. Justice Powell made it clear that other governmental entities might have to show more than Congress before undertaking race-conscious measures: "The degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of the governmental body." *Id.*, at 515–516, n. 14.

Appellant and its supporting *amici* rely heavily on *Fullilove* for the proposition that a city council, like Congress, need not make specific findings of discrimination to engage in race-conscious relief. Thus, appellant argues "[i]t would be a perversion of federalism to hold that the federal government has a compelling interest in remedying the effects of racial discrimination in its own public works program, but a city government does not." Brief for Appellant 32 (footnote omitted).

What appellant ignores is that Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations. See *Katzenbach* v. *Morgan,* 384 U. S., at 651 ("Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment"). See also *South Carolina* v. *Katzenbach,* 383 U. S. 301, 326 (1966) (similar interpretation of congressional power under § 2 of the Fifteenth Amendment). The Civil War Amendments themselves worked a dramatic change in the balance between congressional and state power over matters of race. Speaking of the Thirteenth and Fourteenth Amendments in *Ex parte Virginia,* 100 U. S. 339, 345 (1880), the Court stated: "They were intended to be, what they really are, limitations of the powers of the States and enlargements of the power of Congress."

That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori,* the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under § 5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under § 1. We believe that such a result would be contrary to the intentions of

the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations. See *Associated General Contractors of Cal.* v. *City and Cty. of San Francisco,* 813 F. 2d, at 929 (Kozinski, J.) ("The city is not just like the federal government with regard to the findings it must make to justify race-conscious remedial action"); see also Days, Fullilove, 96 Yale L. J. 453, 474 (1987) (hereinafter Days) (*"Fullilove* clearly focused on the constitutionality of a *congressionally* mandated set-aside program") (emphasis in original); Bohrer, *Bakke, Weber,* and *Fullilove:* Benign Discrimination and Congressional Power to Enforce the Fourteenth Amendment, 56 Ind. L. J. 473, 512–513 (1981) ("Congress may authorize, pursuant to section 5, state action that would be foreclosed to the states acting alone").

We do not, as JUSTICE MARSHALL's dissent suggests, see *post,* at 557–560, find in § 5 of the Fourteenth Amendment some form of federal pre-emption in matters of race. We simply note what should be apparent to all—§ 1 of the Fourteenth Amendment stemmed from a distrust of state legislative enactments based on race; § 5 is, as the dissent notes, "'a *positive* grant of legislative power'" to Congress. *Post,* at 557, quoting *Katzenbach* v. *Morgan, supra,* at 651 (emphasis in dissent). Thus, our treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here. In the *Slaughter-House Cases,* 16 Wall. 36 (1873), cited by the dissent, *post,* at 560, the Court noted that the Civil War Amendments granted "additional powers to the Federal government," and laid "additional restraints upon those of the States." 16 Wall., at 68.

It would seem equally clear, however, that a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimina-

tion within its own legislative jurisdiction.[2] This authority must, of course, be exercised within the constraints of § 1 of the Fourteenth Amendment. Our decision in *Wygant* is not to the contrary. *Wygant* addressed the constitutionality of the use of racial quotas by local school authorities pursuant to an agreement reached with the local teachers' union. It was in the context of addressing the school board's power to adopt a race-based layoff program affecting its own work force that the *Wygant* plurality indicated that the Equal Protection Clause required "some showing of prior discrimination by the governmental unit involved." *Wygant*, 476 U. S., at 274. As a matter of state law, the city of Richmond has legislative authority over its procurement policies, and can use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment. To this extent, on the question of the city's competence, the Court of Appeals erred in following *Wygant* by rote in a case involving a state entity which has state-law authority to address discriminatory practices within local commerce under its jurisdiction.

Thus, if the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system. It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice. Cf. *Norwood* v. *Harrison*, 413 U. S. 455, 465 (1973) ("Racial discrimination in state-operated schools is barred by the Constitution and [i]t is also axiomatic that a state may not induce,

---

[2] In its original panel opinion, the Court of Appeals held that under Virginia law the city had the legal authority to enact the set-aside program. *Croson I*, 779 F. 2d 181, 184–186 (CA4 1985). That determination was not disturbed by the court's subsequent holding that the Plan violated the Equal Protection Clause.

encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish") (citation and internal quotations omitted).

### III

### A

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to *any person* within its jurisdiction the equal protection of the laws." (Emphasis added.) As this Court has noted in the past, the "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Shelley* v. *Kraemer*, 334 U. S. 1, 22 (1948). The Richmond Plan denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race. To whatever racial group these citizens belong, their "personal rights" to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility. See *University of*

*California Regents* v. *Bakke*, 438 U. S., at 298 (opinion of Powell, J.) ("[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth"). We thus reaffirm the view expressed by the plurality in *Wygant* that the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification. *Wygant*, 476 U. S., at 279–280; *id.*, at 285–286 (O'CONNOR, J., concurring in part and concurring in judgment). See also *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 105 (1973) (MARSHALL, J., dissenting) ("The highly suspect nature of classifications based on race, nationality, or alienage is well established") (footnotes omitted).

Our continued adherence to the standard of review employed in *Wygant* does not, as JUSTICE MARSHALL's dissent suggests, see *post*, at 552, indicate that we view "racial discrimination as largely a phenomenon of the past" or that "government bodies need no longer preoccupy themselves with rectifying racial injustice." As we indicate, see *infra*, at 509–510, States and their local subdivisions have many legislative weapons at their disposal both to punish and prevent present discrimination and to remove arbitrary barriers to minority advancement. Rather, our interpretation of § 1 stems from our agreement with the view expressed by Justice Powell in *Bakke* that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Bakke, supra*, at 289–290.

Under the standard proposed by JUSTICE MARSHALL's dissent, "race-conscious classifications designed to further remedial goals," *post*, at 535, are forthwith subject to a relaxed standard of review. How the dissent arrives at the legal conclusion that a racial classification is "designed to further remedial goals," without first engaging in an examination of

the factual basis for its enactment and the nexus between its scope and that factual basis, we are not told. However, once the "remedial" conclusion is reached, the dissent's standard is singularly deferential, and bears little resemblance to the close examination of legislative purpose we have engaged in when reviewing classifications based either on race or gender. See *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648 (1975) ("[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme"). The dissent's watered-down version of equal protection review effectively assures that race will always be relevant in American life, and that the "ultimate goal" of "eliminat[ing] entirely from governmental decisionmaking such irrelevant factors as a human being's race," *Wygant*, *supra*, at 320 (STEVENS, J., dissenting) (footnote omitted), will never be achieved.

Even were we to accept a reading of the guarantee of equal protection under which the level of scrutiny varies according to the ability of different groups to defend their interests in the representative process, heightened scrutiny would still be appropriate in the circumstances of this case. One of the central arguments for applying a less exacting standard to "benign" racial classifications is that such measures essentially involve a choice made by dominant racial groups to disadvantage themselves. If one aspect of the judiciary's role under the Equal Protection Clause is to protect "discrete and insular minorities" from majoritarian prejudice or indifference, see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), some maintain that these concerns are not implicated when the "white majority" places burdens upon itself. See J. Ely, Democracy and Distrust 170 (1980).

In this case, blacks constitute approximately 50% of the population of the city of Richmond. Five of the nine seats on the city council are held by blacks. The concern that a political majority will more easily act to the disadvantage of a mi-

nority based on unwarranted assumptions or incomplete facts would seem to militate for, not against, the application of heightened judicial scrutiny in this case. See Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723, 739, n. 58 (1974) ("Of course it works both ways: a law that favors Blacks over Whites would be suspect if it were enacted by a predominantly Black legislature").

In *Bakke, supra,* the Court confronted a racial quota employed by the University of California at Davis Medical School. Under the plan, 16 out of 100 seats in each entering class at the school were reserved exclusively for certain minority groups. *Id.,* at 288–289. Among the justifications offered in support of the plan were the desire to "reduc[e] the historic deficit of traditionally disfavored minorities in medical school and the medical profession" and the need to "counte[r] the effects of societal discrimination." *Id.,* at 306 (citations omitted). Five Members of the Court determined that none of these interests could justify a plan that completely eliminated nonminorities from consideration for a specified percentage of opportunities. *Id.,* at 271–272 (Powell, J.) (addressing constitutionality of Davis plan); *id.,* at 408 (STEVENS, J., joined by Burger, C. J. and Stewart and REHNQUIST, JJ. concurring in judgment in part and dissenting in part) (addressing only legality of Davis admissions plan under Title VI of the Civil Rights Act of 1964).

Justice Powell's opinion applied heightened scrutiny under the Equal Protection Clause to the racial classification at issue. His opinion decisively rejected the first justification for the racially segregated admissions plan. The desire to have more black medical students or doctors, standing alone, was not merely insufficiently compelling to justify a racial classification, it was "discrimination for its own sake," forbidden by the Constitution. *Id.,* at 307. Nor could the second concern, the history of discrimination in society at large, justify a racial quota in medical school admissions. Justice Powell contrasted the "focused" goal of remedying "wrongs

worked by specific instances of racial discrimination" with "the remedying of the effects of 'societal discrimination,' an amorphous concept of injury that may be ageless in its reach into the past." *Ibid.* He indicated that for the governmental interest in remedying past discrimination to be triggered "judicial, legislative, or administrative findings of constitutional or statutory violations" must be made. *Ibid.* Only then does the government have a compelling interest in favoring one race over another. *Id.,* at 308–309.

In *Wygant,* 476 U. S. 267 (1986), four Members of the Court applied heightened scrutiny to a race-based system of employee layoffs. Justice Powell, writing for the plurality, again drew the distinction between "societal discrimination" which is an inadequate basis for race-conscious classifications, and the type of identified discrimination that can support and define the scope of race-based relief. The challenged classification in that case tied the layoff of minority teachers to the percentage of minority students enrolled in the school district. The lower courts had upheld the scheme, based on the theory that minority students were in need of "role models" to alleviate the effects of prior discrimination in society. This Court reversed, with a plurality of four Justices reiterating the view expressed by Justice Powell in *Bakke* that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant, supra,* at 276.

The role model theory employed by the lower courts failed for two reasons. First, the statistical disparity between students and teachers had no probative value in demonstrating the kind of prior discrimination in hiring or promotion that would justify race-based relief. 476 U. S., at 276; see also *id.,* at 294 (O'CONNOR, J., concurring in part and concurring in judgment) ("The disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination"). Second, because the role model theory had no

relation to some basis for believing a constitutional or statutory violation had occurred, it could be used to "justify" race-based decisionmaking essentially limitless in scope and duration. *Id.*, at 276 (plurality opinion) ("In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future").

## B

We think it clear that the factual predicate offered in support of the Richmond Plan suffers from the same two defects identified as fatal in *Wygant*. The District Court found the city council's "findings sufficient to ensure that, in adopting the Plan, it was remedying the present effects of past discrimination in the *construction industry*." Supp. App. 163 (emphasis added). Like the "role model" theory employed in *Wygant*, a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It "has no logical stopping point." *Wygant, supra,* at 275 (plurality opinion). "Relief" for such an ill-defined wrong could extend until the percentage of public contracts awarded to MBE's in Richmond mirrored the percentage of minorities in the population as a whole.

Appellant argues that it is attempting to remedy various forms of past discrimination that are alleged to be responsible for the small number of minority businesses in the local contracting industry. Among these the city cites the exclusion of blacks from skilled construction trade unions and training programs. This past discrimination has prevented them "from following the traditional path from laborer to entrepreneur." Brief for Appellant 23–24. The city also lists a host of nonracial factors which would seem to face a member of any racial group attempting to establish a new business enterprise, such as deficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding pro-

cedures, and disability caused by an inadequate track record. *Id.*, at 25–26, and n. 41.

While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. Like the claim that discrimination in primary and secondary schooling justifies a rigid racial preference in medical school admissions, an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.

It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it was sheer speculation how many minority medical students would have been admitted to the medical school at Davis absent past discrimination in educational opportunities. Defining these sorts of injuries as "identified discrimination" would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.

These defects are readily apparent in this case. The 30% quota cannot in any realistic sense be tied to any injury suffered by anyone. The District Court relied upon five predicate "facts" in reaching its conclusion that there was an adequate basis for the 30% quota: (1) the ordinance declares itself to be remedial; (2) several proponents of the measure stated their views that there had been past discrimination in the construction industry; (3) minority businesses received 0.67% of prime contracts from the city while minorities constituted 50% of the city's population; (4) there were very few minority contractors in local and state contractors' associations; and (5) in 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry nationally. Supp. App. 163–167.

None of these "findings," singly or together, provide the city of Richmond with a "strong basis in evidence for its conclusion that remedial action was necessary." *Wygant*, 476 U. S., at 277 (plurality opinion). There is nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry. *Id.*, at 274–275; see also *id.*, at 293 (O'CONNOR, J., concurring).

The District Court accorded great weight to the fact that the city council designated the Plan as "remedial." But the mere recitation of a "benign" or legitimate purpose for a racial classification is entitled to little or no weight. See *Weinberger* v. *Wiesenfeld*, 420 U. S., at 648, n. 16 ("This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation"). Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice.

The District Court also relied on the highly conclusionary statement of a proponent of the Plan that there was racial discrimination in the construction industry "in this area, and the State, and around the nation." App. 41 (statement of Councilperson Marsh). It also noted that the city manager had related his view that racial discrimination still plagued the construction industry in his home city of Pittsburgh. *Id.*, at 42 (statement of Mr. Deese). These statements are of little probative value in establishing identified discrimination in the Richmond construction industry. The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary. See *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U. S. 483, 488–489 (1955). But when a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals. See *McLaughlin* v. *Florida*, 379 U. S. 184, 190–192 (1964). A

governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists. See *id.*, at 193; *Wygant, supra*, at 277. The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis. See *Korematsu* v. *United States*, 323 U. S. 214, 235–240 (1944) (Murphy, J., dissenting).

Reliance on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond is similarly misplaced. There is no doubt that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII. *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 307–308 (1977). But it is equally clear that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.*, at 308, n. 13. See also *Mayor of Philadelphia* v. *Educational Equality League*, 415 U. S. 605, 620 (1974) ("[T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded").

In the employment context, we have recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination. See *Teamsters* v. *United States*, 431 U. S. 324, 337–338 (1977) (statistical comparison between minority truckdrivers and relevant population probative of discriminatory exclusion). But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating

discriminatory exclusion must be the number of minorities qualified to undertake the particular task. See *Hazelwood, supra,* at 308; *Johnson* v. *Transportation Agency, Santa Clara County,* 480 U. S. 616, 651–652 (1987) (O'CONNOR, J., concurring in judgment).

In this case, the city does not even know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction projects. Cf. *Ohio Contractors Assn.* v. *Keip,* 713 F. 2d, at 171 (relying on percentage of minority *businesses* in the State compared to percentage of state purchasing contracts awarded to minority firms in upholding set-aside). Nor does the city know what percentage of total city construction dollars minority firms now receive as subcontractors on prime contracts let by the city.

To a large extent, the set-aside of subcontracting dollars seems to rest on the unsupported assumption that white prime contractors simply will not hire minority firms. See *Associated General Contractors of Cal.* v. *City and Cty. of San Francisco,* 813 F. 2d, at 933 ("There is no finding—and we decline to assume—that male caucasian contractors will award contracts only to other male caucasians").[3] Indeed, there is evidence in this record that overall minority participation in city contracts in Richmond is 7 to 8%, and that minority contractor participation in Community Block Development Grant *construction* projects is 17 to 22%. App. 16 (statement of Mr. Deese, City Manager). Without any in-

---

[3] Since 1975 the city of Richmond has had an ordinance on the books prohibiting both discrimination in the award of public contracts and employment discrimination by public contractors. See Reply Brief for Appellant 18, n. 42 (citing Richmond, Va., City Code, § 17.2 *et seq.* (1985)). The city points to no evidence that its prime contractors have been violating the ordinance in either their employment or subcontracting practices. The complete silence of the record concerning enforcement of the city's own antidiscrimination ordinance flies in the face of. the dissent's vision of a "tight-knit industry" which has prevented blacks from obtaining the experience necessary to participate in construction contracting. See *post,* at 542–543.

formation on minority participation in subcontracting, it is quite simply impossible to evaluate overall minority representation in the city's construction expenditures.

The city and the District Court also relied on evidence that MBE membership in local contractors' associations was extremely low. Again, standing alone this evidence is not probative of any discrimination in the local construction industry. There are numerous explanations for this dearth of minority participation, including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices. Blacks may be disproportionately attracted to industries other than construction. See The State of Small Business: A Report of the President 201 (1986) ("Relative to the distribution of all businesses, black-owned businesses are more than proportionally represented in the transportation industry, but considerably less than proportionally represented in the wholesale trade, manufacturing, and finance industries"). The mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination. Cf. *Bazemore* v. *Friday*, 478 U. S. 385, 407–408 (1986) (mere existence of single race clubs in absence of evidence of exclusion by race cannot create a duty to integrate).

For low minority membership in these associations to be relevant, the city would have to link it to the number of local MBE's eligible for membership. If the statistical disparity between eligible MBE's and MBE membership were great enough, an inference of discriminatory exclusion could arise. In such a case, the city would have a compelling interest in preventing its tax dollars from assisting these organizations in maintaining a racially segregated construction market. See *Norwood*, 413 U. S., at 465; *Ohio Contractors, supra,* at 171 (upholding minority set-aside based in part on earlier District Court finding that "the state had become 'a joint participant' with private industry and certain craft unions in

a pattern of racially discriminatory conduct which excluded black laborers from work on public construction contracts").

Finally, the city and the District Court relied on Congress' finding in connection with the set-aside approved in *Fullilove* that there had been nationwide discrimination in the construction industry. The probative value of these findings for demonstrating the existence of discrimination in Richmond is extremely limited. By its inclusion of a waiver procedure in the national program addressed in *Fullilove*, Congress explicitly recognized that the scope of the problem would vary from market area to market area. See *Fullilove*, 448 U. S., at 487 (noting that the presumption that minority firms are disadvantaged by past discrimination may be rebutted by grantees in individual situations).

Moreover, as noted above, Congress was exercising its powers under § 5 of the Fourteenth Amendment in making a finding that past discrimination would cause federal funds to be distributed in a manner which reinforced prior patterns of discrimination. While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief. Congress has made national findings that there has been societal discrimination in a host of fields. If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity. See Days 480–481 ("[I]t is essential that state and local agencies also establish the presence of discrimination in their own bailiwicks, based either upon their own fact-finding processes or upon determinations made by other competent institutions").

JUSTICE MARSHALL apparently views the requirement that Richmond identify the discrimination it seeks to remedy in its own jurisdiction as a mere administrative headache, an

"onerous documentary obligatio[n]." *Post*, at 548. We cannot agree. In this regard, we are in accord with JUSTICE STEVENS' observation in *Fullilove*, that "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *Fullilove*, *supra*, at 533–535 (dissenting opinion) (footnotes omitted). The "evidence" relied upon by the dissent, the history of school desegregation in Richmond and numerous congressional reports, does little to define the scope of any injury to minority contractors in Richmond or the necessary remedy. The factors relied upon by the dissent could justify a preference of any size or duration.

Moreover, JUSTICE MARSHALL's suggestion that findings of discrimination may be "shared" from jurisdiction to jurisdiction in the same manner as information concerning zoning and property values is unprecedented. See *post*, at 547, quoting *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 51–52 (1986). We have never approved the extrapolation of discrimination in one jurisdiction from the experience of another. See *Milliken* v. *Bradley*, 418 U. S. 717, 746 (1974) ("Disparate treatment of white and Negro students occurred within the Detroit school system, and not elsewhere, and on this record the remedy must be limited to that system").

In sum, none of the evidence presented by the city points to any identified discrimination in the Richmond construction industry. We, therefore, hold that the city has failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race. To accept Richmond's claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for "remedial relief" for every disadvantaged group. The dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity

and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs. "Courts would be asked to evaluate the extent of the prejudice and consequent harm suffered by various minority groups. Those whose societal injury is thought to exceed some arbitrary level of tolerability then would be entitled to preferential classifications . . . ." *Bakke*, 438 U. S., at 296–297 (Powell, J.). We think such a result would be contrary to both the letter and spirit of a constitutional provision whose central command is equality.

The foregoing analysis applies only to the inclusion of blacks within the Richmond set-aside program. There is *absolutely no evidence* of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry. The District Court took judicial notice of the fact that the vast majority of "minority" persons in Richmond were black. Supp. App. 207. It may well be that Richmond has never had an Aleut or Eskimo citizen. The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination.

If a 30% set-aside was "narrowly tailored" to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this "remedial relief" with an Aleut citizen who moves to Richmond tomorrow? The gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation. See *Wygant*, 476 U. S., at 284, n. 13 (haphazard inclusion of racial groups "further illustrates the undifferentiated nature of the plan"); see also Days 482 ("Such programs leave one with the sense that the racial and ethnic groups favored by the set-aside were added without attention to whether their inclusion was justified by evidence of past discrimination").

## IV

As noted by the court below, it is almost impossible to assess whether the Richmond Plan is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way. We limit ourselves to two observations in this regard.

First, there does not appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting. See *United States* v. *Paradise,* 480 U. S. 149, 171 (1987) ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the efficacy of alternative remedies"). Many of the barriers to minority participation in the construction industry relied upon by the city to justify a racial classification appear to be race neutral. If MBE's disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, *a fortiori*, lead to greater minority participation. The principal opinion in *Fullilove* found that Congress had carefully examined and rejected race-neutral alternatives before enacting the MBE set-aside. See *Fullilove,* 448 U. S., at 463–467; see also *id.*, at 511 (Powell, J., concurring) ("[B]y the time Congress enacted [the MBE set-aside] in 1977, it knew that other remedies had failed to ameliorate the effects of racial discrimination in the construction industry"). There is no evidence in this record that the Richmond City Council has considered any alternatives to a race-based quota.

Second, the 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the "completely unrealistic" assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population. See *Sheet Metal Workers* v. *EEOC,* 478 U. S. 421, 494 (1986) (O'CONNOR, J., concurring in part and dissenting in part) ("[I]t is completely unrealistic to assume that individuals of

one race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination").

Since the city must already consider bids and waivers on a case-by-case basis, it is difficult to see the need for a rigid numerical quota. As noted above, the congressional scheme upheld in *Fullilove* allowed for a waiver of the set-aside provision where an MBE's higher price was not attributable to the effects of past discrimination. Based upon proper findings, such programs are less problematic from an equal protection standpoint because they treat all candidates individually, rather than making the color of an applicant's skin the sole relevant consideration. Unlike the program upheld in *Fullilove*, the Richmond Plan's waiver system focuses solely on the availability of MBE's; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.

Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification. See *Frontiero* v. *Richardson*, 411 U. S. 677, 690 (1973) (plurality opinion) ("[W]hen we enter the realm of 'strict judicial scrutiny,' there can be no doubt that 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality"). Under Richmond's scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. We think it obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination.

## V

Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. If the city of Richmond had evidence before it that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities, it could take action to end the discriminatory exclusion. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. See *Bazemore* v. *Friday*, 478 U. S., at 398; *Teamsters* v. *United States*, 431 U. S., at 337–339. Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. See, *e. g.*, *New York State Club Assn.* v. *New York City*, 487 U. S. 1, 10–11, 13–14 (1988). In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.

Nor is local government powerless to deal with individual instances of racially motivated refusals to employ minority contractors. Where such discrimination occurs, a city would be justified in penalizing the discriminator and providing appropriate relief to the victim of such discrimination. See generally *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802–803 (1973). Moreover, evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified. See *Teamsters, supra*, at 338.

Even in the absence of evidence of discrimination, the city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races. Simplification of bidding

procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect. Many of the formal barriers to new entrants may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms. Their elimination or modification would have little detrimental effect on the city's interests and would serve to increase the opportunities available to minority business without classifying individuals on the basis of race. The city may also act to prohibit discrimination in the provision of credit or bonding by local suppliers and banks. Business as usual should not mean business pursuant to the unthinking exclusion of certain members of our society from its rewards.

In the case at hand, the city has not ascertained how many minority enterprises are present in the local construction market nor the level of their participation in city construction projects. The city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case. Under such circumstances, it is simply impossible to say that the city has demonstrated "a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant,* 476 U. S., at 277.

Proper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects. Such findings also serve to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself. Absent such findings, there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics. "[I]f there is no duty to attempt either to measure the recovery by the wrong or to distribute that re-

covery within the injured class in an evenhanded way, our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate 'a piece of the action' for its members." *Fullilove*, 448 U. S., at 539 (STEVENS, J., dissenting). Because the city of Richmond has failed to identify the need for remedial action in the awarding of its public construction contracts, its treatment of its citizens on a racial basis violates the dictates of the Equal Protection Clause. Accordingly, the judgment of the Court of Appeals for the Fourth Circuit is

*Affirmed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

A central purpose of the Fourteenth Amendment is to further the national goal of equal opportunity for all our citizens. In order to achieve that goal we must learn from our past mistakes, but I believe the Constitution requires us to evaluate our policy decisions—including those that govern the relationships among different racial and ethnic groups—primarily by studying their probable impact on the future. I therefore do not agree with the premise that seems to underlie today's decision, as well as the decision in *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong. See *ante*, at 493–494.[1] I do, however, agree with the Court's explana-

---

[1] In my view the Court's approach to this case gives unwarranted deference to race-based legislative action that purports to serve a purely remedial goal, and overlooks the potential value of race-based determinations that may serve other valid purposes. With regard to the former point—as I explained at some length in *Fullilove* v. *Klutznick*, 448 U. S. 448, 532–554 (1980) (dissenting opinion)—I am not prepared to assume that even a more narrowly tailored set-aside program supported by stronger findings would be constitutionally justified. Unless the legislature can identify both the particular victims and the particular perpetrators of past

tion of why the Richmond ordinance cannot be justified as a remedy for past discrimination, and therefore join Parts I, III–B, and IV of its opinion. I write separately to emphasize three aspects of the case that are of special importance to me.

First, the city makes no claim that the public interest in the efficient performance of its construction contracts will be served by granting a preference to minority-business enterprises. This case is therefore completely unlike *Wygant*, in which I thought it quite obvious that the school board had reasonably concluded that an integrated faculty could provide educational benefits to the entire student body that could not be provided by an all-white, or nearly all-white, faculty. As I pointed out in my dissent in that case, even if we completely disregard our history of racial injustice, race is not always irrelevant to sound governmental decisionmaking.[2] In the

---

discrimination, which is precisely what a court does when it makes findings of fact and conclusions of law, a *remedial* justification for race-based legislation will almost certainly sweep too broadly. With regard to the latter point: I think it unfortunate that the Court in neither *Wygant* nor this case seems prepared to acknowledge that some race-based policy decisions may serve a legitimate public purpose. I agree, of course, that race is so seldom relevant to legislative decisions on how best to foster the public good that legitimate justifications for race-based legislation will usually not be available. But unlike the Court, I would not totally discount the legitimacy of race-based decisions that may produce tangible and fully justified future benefits. See n. 2, *infra;* see also Justice Powell's discussion in *University of California Regents* v. *Bakke*, 438 U. S. 265, 311–319 (1978).

[2] "Rather than analyzing a case of this kind by asking whether minority teachers have some sort of special entitlement to jobs as a remedy for sins that were committed in the past, I believe that we should first ask whether the Board's action advances the public interest in educating children for the future.

. . . . .

"[I]n our present society, race is not always irrelevant to sound governmental decisionmaking. To take the most obvious example, in law enforcement, if an undercover agent is needed to infiltrate a group suspected of ongoing criminal behavior—and if the members of the group are all of the same race—it would seem perfectly rational to employ an agent of that race rather than a member of a different racial class. Similarly, in a city

case of public contracting, however, if we disregard the past, there is not even an arguable basis for suggesting that the race of a subcontractor or general contractor should have any relevance to his or her access to the market.

Second, this litigation involves an attempt by a legislative body, rather than a court, to fashion a remedy for a past wrong. Legislatures are primarily policymaking bodies that promulgate rules to govern future conduct. The constitutional prohibitions against the enactment of *ex post facto* laws and bills of attainder reflect a valid concern about the use of the political process to punish or characterize past conduct of private citizens.[3] It is the judicial system, rather than the legislative process, that is best equipped to iden-

---

with a recent history of racial unrest, the superintendent of police might reasonably conclude that an integrated police force could develop a better relationship with the community and thereby do a more effective job of maintaining law and order than a force composed only of white officers.

"In the context of public education, it is quite obvious that a school board may reasonably conclude that an integrated faculty will be able to provide benefits to the student body that could not be provided by an all-white, or nearly all-white, faculty. For one of the most important lessons that the American public schools teach is that the diverse ethnic, cultural, and national backgrounds that have been brought together in our famous 'melting pot' do not identify essential differences among the human beings that inhabit our land. It is one thing for a white child to be taught by a white teacher that color, like beauty, is only 'skin deep'; it is far more convincing to experience that truth on a day-to-day basis during the routine, ongoing learning process." *Wygant v. Jackson Board of Education,* 476 U. S., at 313–315 (footnotes omitted).

[3] See U. S. Const., Art. I, § 9, cl. 3, § 10, cl. 1. Of course, legislatures frequently appropriate funds to compensate victims of past governmental misconduct for which there is no judicial remedy. See, *e. g.,* Pub. L. 100–383, 102 Stat. 903 (provision of restitution to interned Japanese-Americans during World War II). Thus, it would have been consistent with normal practice for the city of Richmond to provide direct monetary compensation to any minority-business enterprise that the city might have injured in the past. Such a voluntary decision by a public body is, however, quite different from a decision to require one private party to compensate another for an unproven injury.

tify past wrongdoers and to fashion remedies that will create the conditions that presumably would have existed had no wrong been committed. Thus, in cases involving the review of judicial remedies imposed against persons who have been proved guilty of violations of law, I would allow the courts in racial discrimination cases the same broad discretion that chancellors enjoy in other areas of the law. See *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 15–16 (1971).[4]

Third, instead of engaging in a debate over the proper standard of review to apply in affirmative-action litigation,[5] I believe it is more constructive to try to identify the characteristics of the advantaged. and disadvantaged classes that may justify their disparate treatment. See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 452–453 (1985) (STEVENS, J., concurring).[6] In this case that approach con-

---

[4] As I pointed out in my separate opinion concurring in the judgment in *United States* v. *Paradise*, 480 U. S. 149, 193–194 (1987):

"A party who has been found guilty of repeated and persistent violations of the law bears the burden of demonstrating that the chancellor's efforts to fashion effective relief exceed the bounds of 'reasonableness.' The burden of proof in a case like this is precisely the opposite of that in cases such as *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), and *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), which did not involve any proven violations of law. In such cases the governmental decisionmaker who would make race-conscious decisions must overcome a strong presumption against them. No such burden rests on a federal district judge who has found that the governmental unit before him is guilty of racially discriminatory conduct that violates the Constitution."

[5] "There is only one Equal Protection Clause. It requires every State to govern impartially. It does not direct the courts to apply one standard of review in some cases and a different standard in other cases." *Craig* v. *Boren*, 429 U. S. 190, 211–212 (1976) (STEVENS, J., concurring).

[6] "I have always asked myself whether I could find a 'rational basis' for the classification at issue. The term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word 'rational'—for me at least—includes elements of legitimacy and neutrality

vinces me that, instead of carefully identifying the characteristics of the two classes of contractors that are respectively favored and disfavored by its ordinance, the Richmond City Council has merely engaged in the type of stereotypical analysis that is a hallmark of violations of the Equal Protection Clause. Whether we look at the class of persons benefited by the ordinance or at the disadvantaged class, the same conclusion emerges.

The justification for the ordinance is the fact that in the past white contractors—and presumably other white citizens in Richmond—have discriminated against black contractors. The class of persons benefited by the ordinance is not, however, limited to victims of such discrimination—it encompasses persons who have never been in business in Richmond as well as minority contractors who may have been guilty of discriminating against members of other minority groups. Indeed, for all the record shows, all of the minority-business enterprises that have benefited from the ordinance may be firms that have prospered notwithstanding the discriminatory conduct that may have harmed other minority firms years ago. Ironically, minority firms that have survived in the competitive struggle, rather than those that have perished, are most likely to benefit from an ordinance of this kind.

The ordinance is equally vulnerable because of its failure to identify the characteristics of the disadvantaged class of

---

that must always characterize the performance of the sovereign's duty to govern impartially.

.    .    .    .    .

"In every equal protection case, we have to ask certain basic questions. What class is harmed by the legislation, and has it been subjected to a 'tradition of disfavor' by our laws? What is the public purpose that is being served by the law? What is the characteristic of the disadvantaged class that justifies the disparate treatment? In most cases the answer to these questions will tell us whether the statute has a 'rational basis.'" *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S., at 452–453 (STEVENS, J., concurring).

white contractors that justify the disparate treatment. That class unquestionably includes some white contractors who are guilty of past discrimination against blacks, but it is only habit, rather than evidence or analysis, that makes it seem acceptable to assume that every white contractor covered by the ordinance shares in that guilt. Indeed, even among those who have discriminated in the past, it must be assumed that at least some of them have complied with the city ordinance that has made such discrimination unlawful since 1975.[7] Thus, the composition of the disadvantaged class of white contractors presumably includes some who have been guilty of unlawful discrimination, some who practiced discrimination before it was forbidden by law,[8] and some who have never discriminated against anyone on the basis of race. Imposing a common burden on such a disparate class merely because each member of the class is of the same race stems from reliance on a stereotype rather than fact or reason.[9]

There is a special irony in the stereotypical thinking that prompts legislation of this kind. Although it stigmatizes the disadvantaged class with the unproven charge of past racial discrimination, it actually imposes a greater stigma on its

---

[7] See *ante*, at 502, n. 3.

[8] There is surely some question about the power of a legislature to impose a statutory burden on private citizens for engaging in discriminatory practices at a time when such practices were not unlawful. Cf. *Teamsters v. United States*, 431 U. S. 324, 356–357, 360 (1977).

[9] There is, of course, another possibility that should not be overlooked. The ordinance might be nothing more than a form of patronage. But racial patronage, like a racial gerrymander, is no more defensible than political patronage or a political gerrymander. Cf. *Karcher* v. *Daggett*, 462 U. S. 725, 744–765 (1983) (STEVENS, J., concurring); *Rogers* v. *Lodge*, 458 U. S. 613, 631–653 (1982) (STEVENS, J., dissenting); *Mobile* v. *Bolden*, 446 U. S. 55, 83–94 (1980) (STEVENS, J., concurring in judgment); *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 848–853 (CA7) (Stevens, J., dissenting), cert. denied, 409 U. S. 893 (1972). A southern State with a long history of discrimination against Republicans in the awarding of public contracts could not rely on such past discrimination as a basis for granting a legislative preference to Republican contractors in the future.

supposed beneficiaries. For, as I explained in my opinion in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980):

"[E]ven though it is not the actual predicate for this legislation, a statute of this kind inevitably is ·perceived by many as resting on an assumption that those who are granted this special preference are less qualified in some respect that is identified purely by their race." *Id.*, at 545.

"The risk that habitual attitudes toward classes of persons, rather than analysis of the relevant characteristics of the class, will serve as a basis for a legislative classification is present when benefits are distributed as well as when burdens are imposed. In the past, traditional attitudes too often provided the only explanation for discrimination against women, aliens, illegitimates, and black citizens. Today there is a danger that awareness of past injustice will lead to automatic acceptance of new classifications that are not in fact justified by attributes characteristic of the class as a whole.

"When [government] creates a special preference, or a special disability, for a class of persons, it should identify the characteristic that justifies the special treatment. When the classification is defined in racial terms, I believe that such particular identification is imperative.

"In this case, only two conceivable bases for differentiating the preferred classes from society as a whole have occurred to me: (1) that they were the victims of unfair treatment in the past and (2) that they are less able to compete in the future. Although the first of these factors would justify an appropriate remedy for past wrongs, for reasons that I have already stated, this statute is not such a remedial measure. The second factor is simply not true. Nothing in the record of this case, the legislative history of the Act, or experience that we may notice judicially provides any support for such a proposition." *Id.*, at 552–554 (footnote omitted).

Accordingly, I concur in Parts I, III–B, and IV of the Court's opinion, and in the judgment.

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

I join all but Part II of JUSTICE O'CONNOR's opinion and give this further explanation.

Part II examines our case law upholding congressional power to grant preferences based on overt and explicit classification by race. See *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980). With the acknowledgment that the summary in Part II is both precise and fair, I must decline to join it. The process by which a law that is an equal protection violation when enacted by a State becomes transformed to an equal protection guarantee when enacted by Congress poses a difficult proposition for me; but as it is not before us, any reconsideration of that issue must await some further case. For purposes of the ordinance challenged here, it suffices to say that the State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself. The Fourteenth Amendment ought not to be interpreted to reduce a State's authority in this regard, unless, of course, there is a conflict with federal law or a state remedy is itself a violation of equal protection. The latter is the case presented here.

The moral imperative of racial neutrality is the driving force of the Equal Protection Clause. JUSTICE SCALIA's opinion underscores that proposition, quite properly in my view. The rule suggested in his opinion, which would strike down all preferences which are not necessary remedies to victims of unlawful discrimination, would serve important structural goals, as it would eliminate the necessity for courts to pass upon each racial preference that is enacted. Structural protections may be necessities if moral imperatives are to be obeyed. His opinion would make it crystal clear to the

political branches, at least those of the States, that legislation must be based on criteria other than race.

Nevertheless, given that a rule of automatic invalidity for racial preferences in almost every case would be a significant break with our precedents that require a case-by-case test, I am not convinced we need adopt it at this point. On the assumption that it will vindicate the principle of race neutrality found in the Equal Protection Clause, I accept the less absolute rule contained in JUSTICE O'CONNOR's opinion, a rule based on the proposition that any racial preference must face the most rigorous scrutiny by the courts. My reasons for doing so are as follows. First, I am confident that, in application, the strict scrutiny standard will operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort. Second, the rule against race-conscious remedies is already less than an absolute one, for that relief may be the only adequate remedy after a judicial determination that a State or its instrumentality has violated the Equal Protection Clause. I note, in this connection, that evidence which would support a judicial finding of intentional discrimination may suffice also to justify remedial legislative action, for it diminishes the constitutional responsibilities of the political branches to say they must wait to act until ordered to do so by a court. Third, the strict scrutiny rule is consistent with our precedents, as JUSTICE O'CONNOR's opinion demonstrates.

The ordinance before us falls far short of the standard we adopt. The nature and scope of the injury that existed; its historical or antecedent causes; the extent to which the city contributed to it, either by intentional acts or by passive complicity in acts of discrimination by the private sector; the necessity for the response adopted, its duration in relation to the wrong, and the precision with which it otherwise bore on whatever injury in fact was addressed, were all matters unmeasured, unexplored, and unexplained by the city council. We

are left with an ordinance and a legislative record open to the fair charge that it is not a remedy but is itself a preference which will cause the same corrosive animosities that the Constitution forbids in the whole sphere of government and that our national policy condemns in the rest of society as well. This ordinance is invalid under the Fourteenth Amendment.

JUSTICE SCALIA, concurring in the judgment.

I agree with much of the Court's opinion, and, in particular, with JUSTICE O'CONNOR's conclusion that strict scrutiny must be applied to all governmental classification by race, whether or not its asserted purpose is "remedial" or "benign." *Ante,* at 493, 495. I do not agree, however, with JUSTICE O'CONNOR's dictum suggesting that, despite the Fourteenth Amendment, state and local governments may in some circumstances discriminate on the basis of race in order (in a broad sense) "to ameliorate the effects of past discrimination." *Ante,* at 476–477. The benign purpose of compensating for social disadvantages, whether they have been acquired by reason of prior discrimination or otherwise, can no more be pursued by the illegitimate means of racial discrimination than can other assertedly benign purposes we have repeatedly rejected. See, *e. g., Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 274–276 (1986) (plurality opinion) (discrimination in teacher assignments to provide "role models" for minority students); *Palmore* v. *Sidoti,* 466 U. S. 429, 433 (1984) (awarding custody of child to father, after divorced mother entered an interracial remarriage, in order to spare child social "pressures and stresses"); *Lee* v. *Washington,* 390 U. S. 333 (1968) *(per curiam)* (permanent racial segregation of all prison inmates, presumably to reduce possibility of racial conflict). The difficulty of overcoming the effects of past discrimination is as nothing compared with the difficulty of eradicating from our society the source of those effects, which is the tendency—fatal to a Nation such as ours—to classify and judge men and women on the basis of their country of origin or the color of their skin. A solution

to the first problem that aggravates the second is no solution at all. I share the view expressed by Alexander Bickel that "[t]he lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." A. Bickel, The Morality of Consent 133 (1975). At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb—for example, a prison race riot, requiring temporary segregation of inmates, cf. *Lee* v. *Washington, supra*—can justify an exception to the principle embodied in the Fourteenth Amendment that "[o]ur Constitution is colorblind, and neither knows nor tolerates classes among citizens," *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting); accord, *Ex parte Virginia*, 100 U. S. 339, 345 (1880); 2 J. Story, Commentaries on the Constitution § 1961, p. 677 (T. Cooley ed. 1873); T. Cooley, Constitutional Limitations 439 (2d ed. 1871).

We have in some contexts approved the use of racial classifications by the Federal Government to remedy the effects of past discrimination. I do not believe that we must or should extend those holdings to the States. In *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), we upheld legislative action by Congress similar in its asserted purpose to that at issue here. And we have permitted federal courts to prescribe quite severe, race-conscious remedies when confronted with egregious and persistent unlawful discrimination, see, *e. g., United States* v. *Paradise*, 480 U. S. 149 (1987); *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986). As JUSTICE O'CONNOR acknowledges, however, *ante*, at 486–491, it is one thing to permit racially based conduct by the Federal Government—whose legislative powers concerning matters of race were explicitly enhanced by the Fourteenth Amendment, see U. S. Const., Amdt. 14, § 5—and quite another to permit it by the precise entities against whose conduct in

matters of race that Amendment was specifically directed, see Amdt. 14, § 1. As we said in *Ex parte Virginia, supra,* at 345, the Civil War Amendments were designed to "take away all possibility of oppression by law because of race or color" and "to be . . . limitations on the power of the States and enlargements of the power of Congress." Thus, without revisiting what we held in *Fullilove* (or trying to derive a rationale from the three separate opinions supporting the judgment, none of which commanded more than three votes, compare 448 U. S., at 453–495 (opinion of Burger, C. J., joined by WHITE and Powell, JJ.), with *id.,* at 495–517 (opinion of Powell, J.), and *id.,* at 517–522 (opinion of MARSHALL, J., joined by BRENNAN and BLACKMUN, JJ.)), I do not believe our decision in that case controls the one before us here.

A sound distinction between federal and state (or local) action based on race rests not only upon the substance of the Civil War Amendments, but upon social reality and governmental theory. It is a simple fact that what Justice Stewart described in *Fullilove* as "the dispassionate objectivity [and] the flexibility that are needed to mold a race-conscious remedy around the single objective of eliminating the effects of past or present discrimination"—political qualities already to be doubted in a national legislature, *Fullilove, supra,* at 527 (Stewart, J., with whom REHNQUIST, J., joined, dissenting)—are substantially less likely to exist at the state or local level. The struggle for racial justice has historically been a struggle by the national society against oppression in the individual States. See, *e. g., Ex parte Virginia, supra* (denying writ of habeas corpus to a state judge in custody under federal indictment for excluding jurors on the basis of race); H. Hyman & W. Wiecek, Equal Justice Under Law, 1835–1875, pp. 312–334 (1982); Logan, Judicial Federalism in the Court of History, 66 Ore. L. Rev. 454, 494–515 (1988). And the struggle retains that character in modern times. See, *e. g., Brown* v. *Board of Education,* 349 U. S. 294 (1955) *(Brown II); United States* v. *Montgomery Board of Educa-*

*tion*, 395 U. S. 225 (1969); *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971); *Griffin* v. *Prince Edward County School Board*, 377 U. S. 218 (1964); *Cooper* v. *Aaron*, 358 U. S. 1 (1958). Not all of that struggle has involved discrimination against blacks, see, *e. g.*, *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886) (Chinese); *Hernandez* v. *Texas*, 347 U. S. 475 (1954) (Hispanics), and not all of it has been in the Old South, see, *e. g.*, *Columbus Board of Education* v. *Penick*, 443 U. S. 449 (1979); *Keyes* v. *School Dist. No. 1, Denver, Colorado*, 413 U. S. 189 (1973). What the record shows, in other words, is that racial discrimination against any group finds a more ready expression at the state and local than at the federal level. To the children of the Founding Fathers, this should come as no surprise. An acute awareness of the heightened danger of oppression from political factions in small, rather than large, political units dates to the very beginning of our national history. See G. Wood, The Creation of the American Republic, 1776–1787, pp. 499–506 (1969). As James Madison observed in support of the proposed Constitution's enhancement of national powers:

> "The smaller the society, the fewer probably will be the distinct parties and interests composing it; the fewer the distinct parties and interests, the more frequently will a majority be found of the same party; and the smaller the number of individuals composing a majority, and the smaller the compass within which they are placed, the more easily will they concert and execute their plan of oppression. Extend the sphere and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength and to act in unison with each other." The Federalist No. 10, pp. 82–84 (C. Rossiter ed. 1961).

The prophesy of these words came to fruition in Richmond in the enactment of a set-aside clearly and directly beneficial to the dominant political group, which happens also to be the dominant racial group. The same thing has no doubt happened before in other cities (though the racial basis of the preference has rarely been made textually explicit)—and blacks have often been on the receiving end of the injustice. Where injustice is the game, however, turnabout is not fair play.

In my view there is only one circumstance in which the States may act *by race* to "undo the effects of past discrimination": where that is necessary to eliminate their own maintenance of a system of unlawful racial classification. If, for example, a state agency has a discriminatory pay scale compensating black employees in all positions at 20% less than their nonblack counterparts, it may assuredly promulgate an order raising the salaries of "all black employees" to eliminate the differential. Cf. *Bazemore* v. *Friday*, 478 U. S. 385, 395–396 (1986). This distinction explains our school desegregation cases, in which we have made plain that States and localities sometimes have an obligation to adopt race-conscious remedies. While there is no doubt that those cases have taken into account the continuing "effects" of previously mandated racial school assignment, we have held those effects to justify a race-conscious remedy only because we have concluded, in that context, that they perpetuate a "dual school system." We have stressed each school district's constitutional "duty to *dismantle* its dual system," and have found that "[e]ach instance of a failure or refusal to fulfill this affirmative duty *continues the violation* of the Fourteenth Amendment." *Columbus Board of Education* v. *Penick, supra,* at 458–459 (emphasis added). Concluding in this context that race-neutral efforts at "dismantling the state-imposed dual system" were so ineffective that they might "indicate a lack of good faith," *Green* v. *New Kent County School Board,* 391 U. S. 430, 439 (1968); see also

*Raney* v. *Board of Education of Gould School Dist.*, 391 U. S. 443 (1968), we have permitted, as part of the local authorities' "affirmative duty to disestablish the dual school system[s]," such voluntary (that is, noncourt-ordered) measures as attendance zones drawn to achieve greater racial balance, and out-of-zone assignment by race for the same purpose. *McDaniel* v. *Barresi*, 402 U. S. 39, 40–41 (1971). While thus permitting the use of race to *declassify* racially classified students, teachers, and educational resources, however, we have also made it clear that the remedial power extends no further than the scope of the continuing constitutional violation. See, *e. g.*, *Columbus Board of Education* v. *Penick*, *supra*, at 465; *Dayton Board of Education* v. *Brinkman*, 433 U. S. 406, 420 (1977); *Milliken* v. *Bradley*, 418 U. S. 717, 744 (1974); *Keyes* v. *School Dist. No. 1, Denver, Colorado*, *supra*, at 213. And it is implicit in our cases that after the dual school system has been completely disestablished, the States may no longer assign students by race. Cf. *Pasadena City Board of Education* v. *Spangler*, 427 U. S. 424 (1976) (federal court may not require racial assignment in such circumstances).

Our analysis in *Bazemore* v. *Friday*, *supra*, reflected our unwillingness to conclude, outside the context of school assignment, that the continuing effects of prior discrimination can be equated with state maintenance of a discriminatory system. There we found both that the government's adoption of "wholly neutral admissions" policies for 4–H and Homemaker Clubs sufficed to remedy its prior constitutional violation of maintaining segregated admissions, and that there was no further obligation to use racial reassignments to eliminate continuing effects—that is, any remaining all-black and all-white clubs. 478 U. S., at 407–408. "[H]owever sound *Green* [v. *New Kent County School Board*, *supra*] may have been in the context of the public schools," we said, "it has no application to this wholly different milieu." *Id.*, at 408. The same is so here.

A State can, of course, act "to undo the effects of past discrimination" in many permissible ways that do not involve classification by race. In the particular field of state contracting, for example, it may adopt a preference for small businesses, or even for new businesses — which would make it easier for those previously excluded by discrimination to enter the field. Such programs may well have racially disproportionate impact, but they are not based on race. And, of course, a State may "undo the effects of past discrimination" in the sense of giving the identified victim of state discrimination that which it wrongfully denied him—for example, giving to a previously rejected black applicant the job that, by reason of discrimination, had been awarded to a white applicant, even if this means terminating the latter's employment. In such a context, the white jobholder is not being selected for disadvantageous treatment because of his race, but because he was wrongfully awarded a job to which another is entitled. That is worlds apart from the system here, in which those to be disadvantaged are identified solely by race.

I agree with the Court's dictum that a fundamental distinction must be drawn between the effects of "societal" discrimination and the effects of "identified" discrimination, and that the situation would be different if Richmond's plan were "tailored" to identify those particular bidders who "suffered from the effects of past discrimination by the city or prime contractors." *Ante*, at 507–508. In my view, however, the reason that would make a difference is not, as the Court states, that it would justify race-conscious action—see, *e. g.*, *ante*, at 504–506, 507–508—but rather that it would enable race-neutral remediation. Nothing prevents Richmond from according a contracting preference to identified victims of discrimination. While most of the beneficiaries might be black, neither the beneficiaries nor those disadvantaged by the preference would be identified *on the basis of their race*. In other words, far from justifying racial classification, iden-

tification of actual victims of discrimination makes it less supportable than ever, because more obviously unneeded.

In his final book, Professor Bickel wrote:

> "[A] racial quota derogates the human dignity and individuality of all to whom it is applied; it is invidious in principle as well as in practice. Moreover, it can easily be turned against those it purports to help. The history of the racial quota is a history of subjugation, not beneficence. Its evil lies not in its name, but in its effects: a quota is a divider of society, a creator of castes, and it is all the worse for its racial base, especially in a society desperately striving for an equality that will make race irrelevant." Bickel, The Morality of Consent, at 133.

Those statements are true and increasingly prophetic. Apart from their societal effects, however, which are "in the aggregate disastrous," *id.*, at 134, it is important not to lose sight of the fact that even "benign" racial quotas have individual victims, whose very real injustice we ignore whenever we deny them enforcement of their right not to be disadvantaged on the basis of race. *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 677 (1987) (SCALIA, J., dissenting). As Justice Douglas observed: "A DeFunis who is white is entitled to no advantage by virtue of that fact; nor is he subject to any disability, no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner." *DeFunis* v. *Odegaard*, 416 U. S. 312, 337 (1974) (dissenting opinion). When we depart from this American principle we play with fire, and much more than an occasional DeFunis, Johnson, or Croson burns.

It is plainly true that in our society blacks have suffered discrimination immeasurably greater than any directed at other racial groups. But those who believe that racial preferences can help to "even the score" display, and reinforce, a manner of thinking by race that was the source of the injustice and that will, if it endures within our society, be the

source of more injustice still. The relevant proposition is not that it was blacks, or Jews, or Irish who were discriminated against, but that it was individual men and women, "created equal," who were discriminated against. And the relevant resolve is that that should never happen again. Racial preferences appear to "even the score" (in some small degree) only if one embraces the proposition that our society is appropriately viewed as divided into races, making it right that an injustice rendered in the past to a black man should be compensated for by discriminating against a white. Nothing is worth that embrace. Since blacks have been disproportionately disadvantaged by racial discrimination, any race-neutral remedial program aimed at the disadvantaged *as such* will have a disproportionately beneficial impact on blacks. Only such a program, and not one that operates on the basis of race, is in accord with the letter and the spirit of our Constitution.

Since I believe that the appellee here had a constitutional right to have its bid succeed or fail under a decisionmaking process uninfected with racial bias, I concur in the judgment of the Court.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

It is a welcome symbol of racial progress when the former capital of the Confederacy acts forthrightly to confront the effects of racial discrimination in its midst. In my view, nothing in the Constitution can be construed to prevent Richmond, Virginia, from allocating a portion of its contracting dollars for businesses owned or controlled by members of minority groups. Indeed, Richmond's set-aside program is indistinguishable in all meaningful respects from—and in fact was patterned upon—the federal set-aside plan which this Court upheld in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980).

A majority of this Court holds today, however, that the Equal Protection Clause of the Fourteenth Amendment blocks Richmond's initiative. The essence of the majority's

position[1] is that Richmond has failed to catalog adequate findings to prove that past discrimination has impeded minorities from joining or participating fully in Richmond's construction contracting industry. I find deep irony in second-guessing Richmond's judgment on this point. As much as any municipality in the United States, Richmond knows what racial discrimination is; a century of decisions by this and other federal courts has richly documented the city's disgraceful history of public and private racial discrimination. In any event, the Richmond City Council *has* supported its determination that minorities have been wrongly excluded from local construction contracting. Its proof includes statistics showing that minority-owned businesses have received virtually no city contracting dollars and rarely if ever belonged to area trade associations; testimony by municipal officials that discrimination has been widespread in the local construction industry; and the same exhaustive and widely publicized federal studies relied on in *Fullilove,* studies which showed that pervasive discrimination in the Nation's tight-knit construction industry had operated to exclude minorities from public contracting. These are precisely the types of statistical and testimonial evidence which, until today, this Court had credited in cases approving of race-conscious measures designed to remedy past discrimination.

More fundamentally, today's decision marks a deliberate and giant step backward in this Court's affirmative-action jurisprudence. Cynical of one municipality's attempt to redress the effects of past racial discrimination in a particular industry, the majority launches a grapeshot attack on race-conscious remedies in general. The majority's unnecessary pronouncements will inevitably discourage or prevent governmental entities, particularly States and localities, from acting to rectify the scourge of past discrimination. This is

---

[1] In the interest of convenience, I refer to the opinion in this case authored by JUSTICE O'CONNOR as "the majority," recognizing that certain portions of that opinion have been joined by only a plurality of the Court.

the harsh reality of the majority's decision, but it is not the Constitution's command.

## I

As an initial matter, the majority takes an exceedingly myopic view of the factual predicate on which the Richmond City Council relied when it passed the Minority Business Utilization Plan. The majority analyzes Richmond's initiative as if it were based solely upon the facts about local construction and contracting practices adduced during the city council session at which the measure was enacted. *Ante*, at 479–481. In so doing, the majority downplays the fact that the city council had before it a rich trove of evidence that discrimination in the Nation's construction industry had seriously impaired the competitive position of businesses owned or controlled by members of minority groups. It is only against this backdrop of documented national discrimination, however, that the local evidence adduced by Richmond can be properly understood. The majority's refusal to recognize that Richmond has proved itself no exception to the dismaying pattern of national exclusion which Congress so painstakingly identified infects its entire analysis of this case.

Six years before Richmond acted, Congress passed, and the President signed, the Public Works Employment Act of 1977, Pub. L. 95–28, 91 Stat. 116, 42 U. S. C. § 6701 *et seq.* (Act), a measure which appropriated $4 billion in federal grants to state and local governments for use in public works projects. Section 103(f)(2) of the Act was a minority business set-aside provision. It required state or local grantees to use 10% of their federal grants to procure services or supplies from businesses owned or controlled by members of statutorily identified minority groups, absent an administrative waiver. In 1980, in *Fullilove, supra*, this Court upheld the validity of this federal set-aside. Chief Justice Burger's principal opinion noted the importance of overcoming those "criteria, methods, or practices thought by Congress to have the effect of defeating, or substantially impairing, ac-

cess by the minority business community to public funds made available by congressional appropriations." *Fullilove*, 448 U. S., at 480. Finding the set-aside provision properly tailored to this goal, the Chief Justice concluded that the program was valid under either strict or intermediate scrutiny. *Id.*, at 492. ·

The congressional program upheld in *Fullilove* was based upon an array of congressional and agency studies which documented the powerful influence of racially exclusionary practices in the business world. A 1975 Report by the House Committee on Small Business concluded:

> "The effects of past inequities stemming from racial prejudice have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system.

> "While minority persons comprise about 16 percent of the Nation's population, of the 13 million businesses in the United States, only 382,000, or approximately 3.0 percent, are owned by minority individuals. The most recent data from the Department of Commerce also indicates that the gross receipts of all businesses in this country totals about $2,540.8 billion, and of this amount only $16.6 billion, or about 0.65 percent was realized by minority business concerns.

> "These statistics are not the result of random chance. *The presumption must be made that past discriminatory systems have resulted in present economic inequities.*" H. R. Rep. No. 94–468, pp. 1–2 (1975) (quoted in *Fullilove, supra,* at 465) (opinion of Burger, C. J.) (emphasis deleted and added).

A 1977 Report by the same Committee concluded:

> "[O]ver the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present,

this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities. Minorities, until recently have not participated to any measurable extent, in our total business system generally, or in the construction industry in particular." H. R. Rep. No. 94-1791, p. 18 (1977), summarizing H. R. Rep. No. 94-468, p. 17 (1976 (quoted in *Fullilove, supra,* at 466, n. 48).

Congress further found that minorities seeking initial public contracting assignments often faced immense entry barriers which did not confront experienced nonminority contractors. A report submitted to Congress in 1975 by the United States Commission on Civil Rights, for example, described the way in which fledgling minority-owned businesses were hampered by "deficiencies in working capital, inability to meet bonding requirements, disabilities caused by an inadequate 'track record,' lack of awareness of bidding opportunities, unfamiliarity with bidding procedures, preselection before the formal advertising process, and the exercise of discretion by government procurement officers to disfavor minority businesses." *Fullilove, supra,* at 467 (summarizing United States Comm'n on Civil Rights, Minorities and Women as Government Contractors (May 1975)).

Thus, as of 1977, there was "abundant evidence" in the public domain "that minority businesses ha[d] been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." *Fullilove, supra,* at 477-478.[2] Signifi-

---

[2] Other Reports indicating the dearth of minority-owned businesses include H. R. Rep. No. 92-1615, p. 3 (1972) (Report of the Subcommittee on Minority Small Business Enterprise, finding that the "long history of racial bias" has created "major problems" for minority businessmen); H. R. Doc. No. 92-194, p. 1 (1972) (text of message from President Nixon to Con-

cantly, this evidence demonstrated that discrimination had prevented existing or nascent minority-owned businesses from obtaining not only federal contracting assignments, but state and local ones as well. See *Fullilove, supra,* at 478.[3]

The members of the Richmond City Council were well aware of these exhaustive congressional findings, a point the

gress, describing federal efforts "to press open new doors of opportunity for millions of Americans to whom those doors had previously been barred, or only half-open"); H. R. Doc. No. 92–169, p. 1 (1971) (text of message from President Nixon to Congress, describing paucity of minority business ownership and federal efforts to give "every man an equal chance at the starting line").

[3] Numerous congressional studies undertaken after 1977 and issued before the Richmond City Council convened in April 1983 found that the exclusion of minorities had continued virtually unabated—and that, because of this legacy of discrimination, minority businesses across the Nation had still failed, as of 1983, to gain a real toehold in the business world. See, *e. g.,* H. R. Rep. No. 95–949, pp. 2, 8 (1978) (Report of House Committee on Small Business, finding that minority businesses "are severely undercapitalized" and that many minorities are disadvantaged "because they are identified as members of certain racial categories"); S. Rep. No. 95–1070, pp. 14–15 (1978); (Report of Senate Select Committee on Small Business, finding that the federal effort "has fallen far short of its goal to develop strong and growing disadvantaged small businesses," and "recogniz[ing] the pattern of social and economic discrimination that continues to deprive racial and ethnic minorities, and others, of the opportunity to participate fully in the free enterprise system"); S. Rep. No. 96–31, pp. IX, 107 (1979) (Report of Senate Select Committee on Small Business, finding that many minorities have "suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control"); S. Rep. No. 96–974, p. 3 (1980) (Report of Senate Select Committee on Small Business, finding that government aid must be "significantly increased" if minority-owned businesses are to "have the maximum practical opportunity to develop into viable small businesses"); H. R. Rep. No. 97–956, p. 35 (1982) (Report of House Committee on Small Business, finding that federal programs to aid minority businesses have had "limited success" to date, but concluding that success could be "greatly expanded" with "appropriate corrective actions"); H. R. Rep. No. 98–3, p. 1 (1983) (Report of House Committee on Small Business, finding that "the small business share of Federal contracts continues to be inadequate").

majority, tellingly, elides. The transcript of the session at which the council enacted the local set-aside initiative contains numerous references to the 6-year-old congressional set-aside program, to the evidence of nationwide discrimination barriers described above, and to the *Fullilove* decision itself. See, *e. g.*, App. 14–16, 24 (remarks of City Attorney William H. Hefty); *id.*, at 14–15 (remarks of Councilmember William J. Leidinger); *id.*, at 18 (remarks of minority community task force president Freddie Ray); *id.*, at 25, 41 (remarks of Councilmember Henry L. Marsh III); *id.*, at 42 (remarks of City Manager Manuel Deese).

The city council's members also heard testimony that, although minority groups made up half of the city's population, only 0.67% of the $24.6 million which Richmond had dispensed in construction contracts during the five years ending in March 1983 had gone to minority-owned prime contractors. *Id.*, at 43 (remarks of Councilmember Henry W. Richardson). They heard testimony that the major Richmond area construction trade associations had virtually no minorities among their hundreds of members.[4] Finally, they heard testimony from city officials as to the exclusionary history of the local construction industry.[5] As the District Court noted, not a

---

[4] According to testimony by trade association representatives, the Associated General Contractors of Virginia had no blacks among its 130 Richmond-area members, App. 27–28 (remarks of Stephen Watts); the American Subcontractors Association had no blacks among its 80 Richmond members, *id.*, at 36 (remarks of Patrick Murphy); the Professional Contractors Estimators Association had 1 black member among its 60 Richmond members, *id.*, at 39 (remarks of Al Shuman); the Central Virginia Electrical Contractors Association had 1 black member among its 45 members, *id.*, at 40 (remarks of Al Shuman); and the National Electrical Contractors Association had 2 black members among its 81 Virginia members. *Id.*, at 34 (remarks of Mark Singer).

[5] Among those testifying to the discriminatory practices of Richmond's construction industry was Councilmember Henry Marsh, who had served as mayor of Richmond from 1977 to 1982. Marsh stated:

"I have been practicing law in this community since 1961, and I am familiar with the practices in the construction industry in this area, in the State,

single person who testified before the city council denied that discrimination in Richmond's construction industry had been widespread. Civ. Action No. 84–0021 (ED Va., Dec. 3, 1984) (reprinted in Supp. App. to Juris. Statement 164–165).[6] So long as one views Richmond's local evidence of discrimination against the backdrop of systematic nationwide racial discrimination which Congress had so painstakingly identified in this very industry, this case is readily resolved.

## II

"Agreement upon a means for applying the Equal Protection Clause to an affirmative-action program has eluded this Court every time the issue has come before us." *Wygant* v. *Jackson Bd. of Education,* 476 U. S. 267, 301 (1986) (MARSHALL, J., dissenting). My view has long been that race-conscious classifications designed to further remedial goals "must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to withstand constitutional scrutiny. *University of California Regents* v. *Bakke,* 438 U. S. 265, 359 (1978) (joint opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) (citations omitted); see also *Wygant, supra,* at 301–302 (MARSHALL, J., dissenting); *Fullilove,* 448 U. S., at 517–519

---

and around the nation. And I can say without equivocation, that the general conduct in the construction industry in this area, and the State and around the nation, is one in which race discrimination and exclusion on the basis of race is widespread.

"I think the situation involved in the City of Richmond is the same . . . . I think the question of whether or not remedial action is required is not open to question." *Id.,* at 41.

Manuel Deese, who in his capacity as City Manager had oversight responsibility for city procurement matters, stated that he fully agreed with Marsh's analysis. *Id.,* at 42.

[6] The representatives of several trade associations did, however, deny that their particular organizations engaged in discrimination. See, *e. g., id.,* at 38 (remarks of Al Shuman, on behalf of the Central Virginia Electrical Contractors Association).

(MARSHALL, J., concurring in judgment). Analyzed in terms of this two-pronged standard, Richmond's set-aside, like the federal program on which it was modeled, is "plainly constitutional." *Fullilove, supra,* at 519 (MARSHALL, J., concurring in judgment).

## A

### 1

Turning first to the governmental interest inquiry, Richmond has two powerful interests in setting aside a portion of public contracting funds for minority-owned enterprises. The first is the city's interest in eradicating the effects of past racial discrimination. It is far too late in the day to doubt that remedying such discrimination is a compelling, let alone an important, interest. In *Fullilove,* six Members of this Court deemed this interest sufficient to support a race-conscious set-aside program governing federal contract procurement. The decision, in holding that the federal set-aside provision satisfied the equal protection principles under any level of scrutiny, recognized that the measure sought to remove "barriers to competitive access which had their roots in racial and ethnic discrimination, and which continue today, even absent any intentional discrimination or unlawful conduct." 448 U. S., at 478; see also *id.,* at 502–506 (Powell, J., concurring); *id.,* at 520 (MARSHALL, J., concurring in judgment). Indeed, we have repeatedly reaffirmed the government's interest in breaking down barriers erected by past racial discrimination in cases involving access to public education, *McDaniel* v. *Barresi,* 402 U. S. 39, 41 (1971); *University of California Regents* v. *Bakke,* 438 U. S., at 320 (opinion of Powell, J.); *id.,* at 362–364 (joint opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.), employment, *United States* v. *Paradise,* 480 U. S. 149, 167 (1987) (plurality opinion); *id.,* at 186–189 (Powell, J., concurring), and valuable government contracts, *Fullilove,* 448 U. S., at 481–484 (opinion of Burger, C. J.); *id.,* at 496–497 (Powell,

J., concurring); *id.*, at 521 (MARSHALL, J., concurring in judgment).

Richmond has a second compelling interest in setting aside, where possible, a portion of its contracting dollars. That interest is the prospective one of preventing the city's own spending decisions from reinforcing and perpetuating the exclusionary effects of past discrimination. See *Fullilove*, 448 U. S., at 475 (noting Congress' conclusion that "the subcontracting practices of prime contractors could perpetuate the prevailing impaired access by minority businesses to public contracting opportunities"); *id.*, at 503 (Powell, J., concurring).

The majority pays only lipservice to this additional governmental interest. See *ante*, at 491–493, 503–504. But our decisions have often emphasized the danger of the government tacitly adopting, encouraging, or furthering racial discrimination even by its own routine operations. In *Shelley* v. *Kraemer*, 334 U. S. 1 (1948), this Court recognized this interest as a constitutional command, holding unanimously that the Equal Protection Clause forbids courts to enforce racially restrictive covenants even where such covenants satisfied all requirements of state law and where the State harbored no discriminatory intent. Similarly, in *Norwood* v. *Harrison*, 413 U. S. 455 (1973), we invalidated a program in which a State purchased textbooks and loaned them to students in public and private schools, including private schools with racially discriminatory policies. We stated that the Constitution requires a State "to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination." *Id.*, at 467; see also *Gilmore* v. *City of Montgomery*, 417 U. S. 556 (1974) (upholding federal-court order forbidding city to allow private segregated schools which allegedly discriminated on the basis of race to use public parks).

The majority is wrong to trivialize the continuing impact of government acceptance or use of private institutions or structures once wrought by discrimination. When government channels all its contracting funds to a white-dominated community of established contractors whose racial homogeneity is the product of private discrimination, it does more than place its *imprimatur* on the practices which forged and which continue to define that community. It also provides a measurable boost to those economic entities that have thrived within it, while denying important economic benefits to those entities which, but for prior discrimination, might well be better qualified to receive valuable government contracts. In my view, the interest in ensuring that the government does not reflect and reinforce prior private discrimination in dispensing public contracts is every bit as strong as the interest in eliminating private discrimination—an interest which this Court has repeatedly deemed compelling. See, *e. g.*, *New York State Club Assn.* v. *New York City*, 487 U. S. 1, 14, n. 5 (1988); *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537, 549 (1987); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 623 (1984); *Bob Jones University* v. *United States*, 461 U. S. 574, 604 (1983); *Runyon* v. *McCrary*, 427 U. S. 160, 179 (1976). The more government bestows its rewards on those persons or businesses that were positioned to thrive during a period of private racial discrimination, the tighter the deadhand grip of prior discrimination becomes on the present and future. Cities like Richmond may not be constitutionally required to adopt set-aside plans. But see *North Carolina Bd. of Education* v. *Swann*, 402 U. S. 43, 46 (1971) (Constitution may require consideration of race in remedying state-sponsored school segregation); *McDaniel, supra*, at 41 (same, and stating that "[a]ny other approach would freeze the status quo that is the very target of all desegregation processes"). But there can be no doubt that when Richmond acted affirmatively to stem the perpetuation of patterns of discrimination through

its own decisionmaking, it served an interest of the highest order.

2

The remaining question with respect to the "governmental interest" prong of equal protection analysis is whether Richmond has proffered satisfactory proof of past racial discrimination to support its twin interests in remediation and in governmental nonperpetuation. Although the Members of this Court have differed on the appropriate standard of review for race-conscious remedial measures, see *United States v. Paradise*, 480 U. S., at 166, and 166–167, n. 17 (plurality opinion); *Sheet Metal Workers v. EEOC*, 478 U. S. 421, 480 (1986) (plurality opinion), we have always regarded this factual inquiry as a practical one. Thus, the Court has eschewed rigid tests which require the provision of particular species of evidence, statistical or otherwise. At the same time we have required that government adduce evidence that, taken as a whole, is sufficient to support its claimed interest and to dispel the natural concern that it acted out of mere "paternalistic stereotyping, not on a careful consideration of modern social conditions." *Fullilove v. Klutznick*, *supra*, at 519 (MARSHALL, J., concurring in judgment).

The separate opinions issued in *Wygant v. Jackson Bd. of Education*, a case involving a school board's race-conscious layoff provision, reflect this shared understanding. Justice Powell's opinion for a plurality of four Justices stated that "the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." 476 U. S., at 277. JUSTICE O'CONNOR's separate concurrence required "a firm basis for concluding that remedial action was appropriate." *Id.*, at 293. The dissenting opinion I authored, joined by JUSTICES BRENNAN and BLACKMUN, required a government body to present a "legitimate factual predicate" and a reviewing court to "genuinely consider the circumstances of the provision at issue." *Id.*, at 297, 303. Finally, JUSTICE

STEVENS' separate dissent sought and found "a rational and unquestionably legitimate basis" for the school board's action. *Id.*, at 315–316. Our unwillingness to go beyond these generalized standards to require specific types of proof in all circumstances reflects, in my view, an understanding that discrimination takes a myriad of "ingenious and pervasive forms." *University of California Regents* v. *Bakke*, 438 U. S., at 387 (separate opinion of MARSHALL, J.).

The varied body of evidence on which Richmond relied provides a "strong," "firm," and "unquestionably legitimate" basis upon which the city council could determine that the effects of past racial discrimination warranted a remedial and prophylactic governmental response. As I have noted, *supra*, at 530–534, Richmond acted against a backdrop of congressional and Executive Branch studies which demonstrated with such force the nationwide pervasiveness of prior discrimination that Congress presumed that "'present economic inequities'" in construction contracting resulted from "'past discriminatory systems.'" *Supra*, at 531 (quoting H. R. Rep. No. 94–468, pp. 1–2 (1975)). The city's local evidence confirmed that Richmond's construction industry did not deviate from this pernicious national pattern. The fact that just 0.67% of public construction expenditures over the previous five years had gone to minority-owned prime contractors, despite the city's racially mixed population, strongly suggests that construction contracting in the area was rife with "present economic inequities." To the extent this enormous disparity did not itself demonstrate that discrimination had occurred, the descriptive testimony of Richmond's elected and appointed leaders drew the necessary link between the pitifully small presence of minorities in construction contracting and past exclusionary practices. That *no one* who testified challenged this depiction of widespread racial discrimination in area construction contracting lent significant weight to these accounts. The fact that area trade associations had virtually no minority members dramatized the extent of present

inequities and suggested the lasting power of past discriminatory systems. In sum, to suggest that the facts on which Richmond has relied do not provide a sound basis for its finding of past racial discrimination simply blinks credibility.

Richmond's reliance on localized, industry-specific findings is a far cry from the reliance on generalized "societal discrimination" which the majority decries as a basis for remedial action. *Ante*, at 496, 499, 505. But characterizing the plight of Richmond's minority contractors as mere "societal discrimination" is not the only respect in which the majority's critique shows an unwillingness to come to grips with why construction-contracting in Richmond is essentially a whites-only enterprise. The majority also takes the disingenuous approach of disaggregating Richmond's local evidence, attacking it piecemeal, and thereby concluding that no *single* piece of evidence adduced by the city, "standing alone," see, *e. g., ante*, at 503, suffices to prove past discrimination. But items of evidence do not, of course, "stan[d] alone" or exist in alien juxtaposition; they necessarily work together, reinforcing or contradicting each other.

In any event, the majority's criticisms of individual items of Richmond's evidence rest on flimsy foundations. The majority states, for example, that reliance on the disparity between the share of city contracts awarded to minority firms (0.67%) and the minority population of Richmond (approximately 50%) is "misplaced." *Ante*, at 501. It is true that, when the factual predicate needed to be proved is one of *present* discrimination, we have generally credited statistical contrasts between the racial composition of a work force and the general population as proving discrimination only where this contrast revealed "gross statistical disparities." *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 307–308 (1977) (Title VII case); see also *Teamsters* v. *United States*, 431 U. S. 324, 339 (1977) (same). But this principle does not impugn Richmond's statistical contrast, for two reasons. First, considering how minuscule the share of Richmond pub-

542

lic construction contracting dollars received by minority-owned businesses is, it is hardly unreasonable to conclude that this case involves a "gross statistical disparit[y]." *Hazelwood School Dist.*, *supra*, at 307. There are roughly equal numbers of minorities and nonminorities in Richmond—yet minority-owned businesses receive *one-seventy-fifth* of the public contracting funds that other businesses receive. See *Teamsters*, *supra*, at 342, n. 23 ("[F]ine tuning of the statistics could not have obscured the glaring absence of minority [bus] drivers. . . . [T]he company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero'") (citation omitted) (quoted in *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 656–657 (1987) (O'CONNOR, J., concurring in judgment)).

Second, and more fundamentally, where the issue is not present discrimination but rather whether *past* discrimination has resulted in the *continuing exclusion* of minorities from a historically tight-knit industry, a contrast between population and work force is entirely appropriate to help gauge the degree of the exclusion. In *Johnson* v. *Transportation Agency, Santa Clara County, supra*, JUSTICE O'CONNOR specifically observed that, when it is alleged that discrimination has prevented blacks from "obtaining th[e] experience" needed to qualify for a position, the "relevant comparison" is not to the percentage of blacks in the pool of qualified candidates, but to "the total percentage of blacks in the labor force." *Id.*, at 651; see also *Steelworkers* v. *Weber*, 443 U. S. 193, 198–199, and n. 1 (1979); *Teamsters, supra*, at 339, n. 20. This contrast is especially illuminating in cases like this, where a main avenue of introduction into the work force—here, membership in the trade associations whose members presumably train apprentices and help them procure subcontracting assignments—is itself grossly dominated by nonminorities. The majority's assertion that the city "does not even know how many MBE's in the relevant market are qualified," *ante*, at 502, is thus entirely beside the

point. If Richmond indeed has a monochromatic contracting community—a conclusion reached by the District Court, see Civ. Action No. 84–0021 (ED Va. 1984) (reprinted in Supp. App. to Juris. Statement 164)—this most likely reflects the lingering power of past exclusionary practices. Certainly this is the explanation Congress has found persuasive at the national level. See *Fullilove*, 448 U. S., at 465. The city's requirement that prime public contractors set aside 30% of their subcontracting assignments for minority-owned enterprises, subject to the ordinance's provision for waivers where minority-owned enterprises are unavailable or unwilling to participate, is designed precisely to ease minority contractors into the industry.

The majority's perfunctory dismissal of the testimony of Richmond's appointed and elected leaders is also deeply disturbing. These officials—including councilmembers, a former mayor, and the present city manager—asserted that race discrimination in area contracting had been widespread, and that the set-aside ordinance was a sincere and necessary attempt to eradicate the effects of this discrimination. The majority, however, states that where racial classifications are concerned, "simple legislative assurances of good intention cannot suffice." *Ante*, at 500. It similarly discounts as minimally probative the city council's designation of its set-aside plan as remedial. "[B]lind judicial deference to legislative or executive pronouncements," the majority explains, "has no place in equal protection analysis." *Ante*, at 501.

No one, of course, advocates "blind judicial deference" to the findings of the city council or the testimony of city leaders. The majority's suggestion that wholesale deference is what Richmond seeks is a classic straw-man argument. But the majority's trivialization of the testimony of Richmond's leaders is dismaying in a far more serious respect. By disregarding the testimony of local leaders and the judgment of local government, the majority does violence to the very principles of comity within our federal system which this

Court has long championed. Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good "within their respective spheres of authority." *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 244 (1984); see also *FERC* v. *Mississippi*, 456 U. S. 742, 777–778 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part). The majority, however, leaves any traces of comity behind in its headlong rush to strike down Richmond's race-conscious measure.

Had the majority paused for a moment on the facts of the Richmond experience, it would have discovered that the city's leadership is deeply familiar with what racial discrimination is. The members of the Richmond City Council have spent long years witnessing multifarious acts of discrimination, including, but not limited to, the deliberate diminution of black residents' voting rights, resistance to school desegregation, and publicly sanctioned housing discrimination. Numerous decisions of federal courts chronicle this disgraceful recent history. In *Richmond* v. *United States*, 422 U. S. 358 (1975), for example, this Court denounced Richmond's decision to annex part of an adjacent county at a time when the city's black population was nearing 50% because it was "infected by the impermissible purpose of denying the right to vote based on race through perpetuating white majority power to exclude Negroes from office." *Id.*, at 373; see also *id.*, at 382 (BRENNAN, J., dissenting) (describing Richmond's "flagrantly discriminatory purpose . . . to avert a transfer of political control to what was fast becoming a black-population majority") (citation omitted).[7]

In *Bradley* v. *School Bd. of Richmond*, 462 F. 2d 1058, 1060, n. 1 (CA4 1972), aff'd by an equally divided Court, 412

---

[7] For a disturbing description of the lengths to which some Richmond white officials went during recent decades to hold in check growing black political power, see J. Moeser & R. Dennis, The Politics of Annexation— Oligarchic Power in a Southern City 50–188 (1982).

U. S. 92 (1973), the Court of Appeals for the Fourth Circuit, sitting en banc, reviewed in the context of a school desegregation case Richmond's long history of inadequate compliance with *Brown* v. *Board of Education*, 347 U. S. 483 (1954), and the cases implementing its holding. The dissenting judge elaborated:

> "The sordid history of Virginia's, and Richmond's attempts to circumvent, defeat, and nullify the holding of *Brown I* has been recorded in the opinions of this and other courts, and need not be repeated in detail here. It suffices to say that there was massive resistance and every state resource, including the services of the legal officers of the state, the services of private counsel (costing the State hundreds of thousands of dollars), the State police, and the power and prestige of the Governor, was employed to defeat *Brown I*. In Richmond, as has been mentioned, not even freedom of choice became actually effective until 1966, *twelve years after the decision of Brown I*." 462 F. 2d, at 1075 (Winter, J.) (emphasis in original) (footnotes and citations omitted).

The Court of Appeals majority in *Bradley* used equally pungent words in describing public and private housing discrimination in Richmond. Though rejecting the black plaintiffs' request that it consolidate Richmond's school district with those of two neighboring counties, the majority nonetheless agreed with the plaintiffs' assertion that "within the City of Richmond there has been state (also federal) action tending to perpetuate apartheid of the races in ghetto patterns throughout the city." *Id.*, at 1065 (citing numerous public and private acts of discrimination).[8]

---

[8] Again the dissenting judge—who would have consolidated the school districts—elaborated:

"[M]any other instances of state and private action contribut[ed] to the concentration of black citizens within Richmond and white citizens without. These were principally in the area of residential development. Racially restrictive convenants were freely employed. Racially discriminatory

When the legislatures and leaders of cities with histories of pervasive discrimination testify that past discrimination has infected one of their industries, armchair cynicism like that exercised by the majority has no place. It may well be that "the autonomy of a State is an essential component of federalism," *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 588 (1985) (O'CONNOR, J., dissenting), and that "each State is sovereign within its own domain, governing its citizens and providing for their general welfare," *FERC* v. *Mississippi, supra,* at 777 (O'CONNOR, J., dissenting), but apparently this is not the case when federal judges, with nothing but their impressions to go on, choose to disbelieve the explanations of these local governments and officials. Disbelief is particularly inappropriate here in light of the fact that appellee Croson, which had the burden of proving unconstitutionality at trial, *Wygant*, 476 U. S., at 277–278 (plurality opinion), has *at no point* come forward with *any* direct evidence that the city council's motives were anything other than sincere.[9]

Finally, I vehemently disagree with the majority's dismissal of the congressional and Executive Branch findings

practices in the prospective purchase of county property by black purchasers were followed. Urban renewal, subsidized public housing and government-sponsored home mortgage insurance had been undertaken on a racially discriminatory basis. [The neighboring counties] provided schools, roads, zoning and development approval for the rapid growth of the white population in each county at the expense of the city, without making any attempt to assure that the development that they made possible was integrated. Superimposed on the pattern of government-aided residential segregation . . . had been a discriminatory policy of school construction, i. e., the selection of school construction sites in the center of racially identifiable neighborhoods manifestly to serve the educational needs of students of a single race.

"The majority does not question the accuracy of these facts." 462 F. 2d, at 1075–1076 (Winter, J.) (emphasis in original) (footnote omitted).

[9] Cf. *Fullilove* v. *Klutznick*, 448 U. S. 448, 541 (1980) (STEVENS, J., dissenting) (noting statements of sponsors of federal set-aside that measure was designed to give their constituents "a piece of the action").

noted in *Fullilove* as having "extremely limited" probative value in this case. *Ante*, at 504. The majority concedes that Congress established nothing less than a "presumption" that minority contracting firms have been disadvantaged by prior discrimination. *Ibid.* The majority, inexplicably, would forbid Richmond to "share" in this information, and permit only Congress to take note of these ample findings. *Ante*, at 504–505. In thus requiring that Richmond's local evidence be severed from the context in which it was prepared, the majority would require cities seeking to eradicate the effects of past discrimination within their borders to reinvent the evidentiary wheel and engage in unnecessarily duplicative, costly, and time-consuming factfinding.

No principle of federalism or of federal power, however, forbids a state or local government to draw upon a nationally relevant historical record prepared by the Federal Government. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 51–52 (1986) (city is "entitled to rely on the experiences of Seattle and other cities" in enacting an adult theater ordinance, as the First Amendment "does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the cities relies upon is reasonably believed to be relevant to the problem that the city addresses"); see also *Steelworkers* v. *Weber*, 443 U. S., at 198, n. 1 ("Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice"); cf. *Wygant, supra*, at 296 (MARSHALL, J., dissenting) ("No race-conscious provision that purports to serve a remedial purpose can be fairly assessed in a vacuum").[10] Of course, Richmond could have built an even more

---

[10] Although the majority sharply criticizes Richmond for using data which it did not itself develop, it is noteworthy that the federal set-aside program upheld in *Fullilove* was adopted as a floor amendment "without any congressional hearings or investigation whatsoever." L. Tribe, American Constitutional Law 345 (2d ed. 1988). The principal opinion in *Fullilove*

compendious record of past discrimination, one including additional stark statistics and additional individual accounts of past discrimination. But nothing in the Fourteenth Amendment imposes such onerous documentary obligations upon States and localities once the reality of past discrimination is apparent. See *infra*, at 555–561.

## B

In my judgment, Richmond's set-aside plan also comports with the second prong of the equal protection inquiry, for it is substantially related to the interests it seeks to serve in remedying past discrimination and in ensuring that municipal contract procurement does not perpetuate that discrimination. The most striking aspect of the city's ordinance is the similarity it bears to the "appropriately limited" federal set-aside provision upheld in *Fullilove*. 448 U. S., at 489. Like the federal provision, Richmond's is limited to five years in duration, *ibid.*, and was not renewed when it came up for reconsideration in 1988. Like the federal provision, Richmond's contains a waiver provision freeing from its subcontracting requirements those nonminority firms that demonstrate that they cannot comply with its provisions. *Id.*, at 483–484. Like the federal provision, Richmond's has a minimal impact on innocent third parties. While the measure affects 30% of *public* contracting dollars, that translates to only

---

justified the set-aside by relying heavily on the aforementioned studies by agencies like the Small Business Administration and on legislative reports prepared in connection with prior, failed legislation. See *Fullilove* v. *Klutznick*, 448 U. S., at 478 (opinion of Burger, C. J.) ("Although the Act recites no preambulary 'findings' on the subject, we are satisfied that Congress had abundant historical basis from which it could conclude that traditional procurement practices, when applied to minority businesses, could perpetuate the effects of prior discrimination"); see also *id.*, at 549–550, and n. 25 (STEVENS, J., dissenting) (noting "perfunctory" consideration accorded the set-aside provision); Days, Fullilove, 96 Yale L. J. 453, 465 (1987) ("One can only marvel at the fact that the minority set-aside provision was enacted into law without hearings or committee reports, and with only token opposition") (citation and footnote omitted).

3% of overall Richmond area contracting. Brief for Appellant 44, n. 73 (recounting federal census figures on construction in Richmond); see *Fullilove, supra,* at 484 (burden shouldered by nonminority firms is "relatively light" compared to "overall construction contracting opportunities").

Finally, like the federal provision, Richmond's does not interfere with any vested right of a contractor to a particular contract; instead it operates entirely prospectively. 448 U. S., at 484. Richmond's initiative affects only future economic arrangements and imposes only a diffuse burden on nonminority competitors—here, businesses owned or controlled by nonminorities which seek subcontracting work on public construction projects. The plurality in *Wygant* emphasized the importance of not disrupting the settled and legitimate expectations of innocent parties. "While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive." *Wygant,* 476 U. S., at 283; see *Steelworkers* v. *Weber, supra,* at 208.

These factors, far from "justify[ing] a preference of any size or duration," *ante,* at 505, are precisely the factors to which this Court looked in *Fullilove.* The majority takes issue, however, with two aspects of Richmond's tailoring: the city's refusal to explore the use of race-neutral measures to increase minority business participation in contracting, *ante,* at 507, and the selection of a 30% set-aside figure. *Ante,* at 507–508. The majority's first criticism is flawed in two respects. First, the majority overlooks the fact that since 1975, Richmond has barred both discrimination by the city in awarding public contracts and discrimination by public contractors. See Richmond, Va., City Code § 17.1 *et seq.* (1985). The virtual absence of minority businesses from the city's contracting rolls, indicated by the fact that such businesses have received less than 1% of public contracting dollars,

strongly suggests that this ban has not succeeded in redressing the impact of past discrimination or in preventing city contract procurement from reinforcing racial homogeneity. Second, the majority's suggestion that Richmond should have first undertaken such race-neutral measures as a program of city financing for small firms, *ante*, at 507, ignores the fact that such measures, while theoretically appealing, have been discredited by Congress as ineffectual in eradicating the effects of past discrimination in this very industry. For this reason, this Court in *Fullilove* refused to fault Congress for not undertaking race-neutral measures as precursors to its race-conscious set-aside. See *Fullilove*, 448 U. S., at 463–467 (noting inadequacy of previous measures designed to give experience to minority businesses); see also *id.*, at 511 (Powell, J., concurring) ("By the time Congress enacted [the federal set-aside] in 1977, it knew that other remedies had failed to ameliorate the effects of racial discrimination in the construction industry"). The Equal Protection Clause does not require Richmond to retrace Congress' steps when Congress has found that those steps lead nowhere. Given the well-exposed limitations of race-neutral measures, it was thus appropriate for a municipality like Richmond to conclude that, in the words of JUSTICE BLACKMUN, "[i]n order to get beyond racism, we must first take account of race. There is no other way." *University of California Regents* v. *Bakke*, 438 U. S., at 407 (separate opinion).[11]

---

[11] The majority also faults Richmond's ordinance for including within its definition of "minority group members" not only black citizens, but also citizens who are "Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons." *Ante*, at 506. This is, of course, precisely the same definition Congress adopted in its set-aside legislation. *Fullilove, supra*, at 454. Even accepting the majority's view that Richmond's ordinance is overbroad because it includes groups, such as Eskimos or Aleuts, about whom no evidence of local discrimination has been proffered, it does not necessarily follow that the balance of Richmond's ordinance should be invalidated.

As for Richmond's 30% target, the majority states that this figure "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Ante*, at 507. The majority ignores two important facts. First, the set-aside measure affects only 3% of overall city contracting; thus, any imprecision in tailoring has far less impact than the majority suggests. But more important, the majority ignores the fact that Richmond's 30% figure was patterned directly on the *Fullilove* precedent. Congress' 10% figure fell "roughly halfway between the present percentage of minority contractors and the percentage of minority group members in the Nation." *Fullilove, supra,* at 513–514 (Powell, J., concurring). The Richmond City Council's 30% figure similarly falls roughly halfway between the present percentage of Richmond-based minority contractors (almost zero) and the percentage of minorities in Richmond (50%). In faulting Richmond for not presenting a different explanation for its choice of a set-aside figure, the majority honors *Fullilove* only in the breach.

### III

I would ordinarily end my analysis at this point and conclude that Richmond's ordinance satisfies both the governmental interest and substantial relationship prongs of our Equal Protection Clause analysis. However, I am compelled to add more, for the majority has gone beyond the facts of this case to announce a set of principles which unnecessarily restricts the power of governmental entities to take race-conscious measures to redress the effects of prior discrimination.

### A

Today, for the first time, a majority of this Court has adopted strict scrutiny as its standard of Equal Protection Clause review of race-conscious remedial measures. *Ante*, at 493–494; *ante,* at 520 (SCALIA, J., concurring in judgment). This is an unwelcome development. A profound difference separates governmental actions that themselves are racist,

and governmental actions that seek to remedy the effects of prior racism or to prevent neutral governmental activity from perpetuating the effects of such racism. See, *e. g.*, *Wygant* v. *Jackson Bd. of Education*, 476 U. S., at 301–302 (MARSHALL, J., dissenting); *Fullilove, supra*, at 517–519 (MARSHALL, J., concurring in judgment); *University of California Regents* v. *Bakke*, 438 U. S., at 355–362 (joint opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

Racial classifications "drawn on the presumption that one race is inferior to another or because they put the weight of government behind racial hatred and separatism" warrant the strictest judicial scrutiny because of the very irrelevance of these rationales. *Id.*, at 357–358. By contrast, racial classifications drawn for the purpose of remedying the effects of discrimination that itself was race based have a highly pertinent basis: the tragic and indelible fact that discrimination against blacks and other racial minorities in this Nation has pervaded our Nation's history and continues to scar our society. As I stated in *Fullilove:* "Because the consideration of race is relevant to remedying the continuing effects of past racial discrimination, and because governmental programs employing racial classifications for remedial purposes can be crafted to avoid stigmatization, . . . such programs should not be subjected to conventional 'strict scrutiny'—scrutiny that is strict in theory, but fatal in fact." *Fullilove, supra*, at 518–519 (citation omitted).

In concluding that remedial classifications warrant no different standard of review under the Constitution than the most brutal and repugnant forms of state-sponsored racism, a majority of this Court signals that it regards racial discrimination as largely a phenomenon of the past, and that government bodies need no longer preoccupy themselves with rectifying racial injustice. I, however, do not believe this Nation is anywhere close to eradicating racial discrimination or its vestiges. In constitutionalizing its wishful think-

ing, the majority today does a grave disservice not only to those victims of past and present racial discrimination in this Nation whom government has sought to assist, but also to this Court's long tradition of approaching issues of race with the utmost sensitivity.

B

I am also troubled by the majority's assertion that, even if it did not believe generally in strict scrutiny of race-based remedial measures, "the circumstances of this case" require this Court to look upon the Richmond City Council's measure with the strictest scrutiny. *Ante*, at 495. The sole such circumstance which the majority cites, however, is the fact that blacks in Richmond are a "dominant racial grou[p]" in the city. *Ibid.* In support of this characterization of dominance, the majority observes that "blacks constitute approximately 50% of the population of the city of Richmond" and that "[f]ive of the nine seats on the City Council are held by blacks." *Ibid.*

While I agree that the numerical and political supremacy of a given racial group is a factor bearing upon the level of scrutiny to be applied, this Court has never held that numerical inferiority, standing alone, makes a racial group "suspect" and thus entitled to strict scrutiny review. Rather, we have identified *other* "traditional indicia of suspectness": whether a group has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973).

It cannot seriously be suggested that nonminorities in Richmond have any "history of purposeful unequal treatment." *Ibid.* Nor is there any indication that they have any of the disabilities that have characteristically afflicted those groups this Court has deemed suspect. Indeed, the numerical and political dominance of nonminorities within

the State of Virginia and the Nation as a whole provides an enormous political check against the "simple racial politics" at the municipal level which the majority fears. *Ante*, at 493. If the majority really believes that groups like Richmond's nonminorities, which constitute approximately half the population but which are outnumbered even marginally in political fora, are deserving of suspect class status for these reasons alone, this Court's decisions denying suspect status to women, see *Craig* v. *Boren*, 429 U. S. 190, 197 (1976), and to persons with below-average incomes, see *San Antonio Independent School Dist.*, *supra*, at 28, stand on extremely shaky ground. See *Castaneda* v. *Partida*, 430 U. S. 482, 504 (1977) (MARSHALL, J., concurring).

In my view, the "circumstances of this case," *ante*, at 495, underscore the importance of *not* subjecting to a strict scrutiny straitjacket the increasing number of cities which have recently come under minority leadership and are eager to rectify, or at least prevent the perpetuation of, past racial discrimination. In many cases, these cities will be the ones with the most in the way of prior discrimination to rectify. Richmond's leaders had just witnessed decades of publicly sanctioned racial discrimination in virtually all walks of life — discrimination amply documented in the decisions of the federal judiciary. See *supra*, at 544–546. This history of "purposefully unequal treatment" forced upon minorities, not imposed by them, should raise an inference that minorities in Richmond had much to remedy — and that the 1983 set-aside was undertaken with sincere remedial goals in mind, not "simple racial politics." *Ante*, at 493.

Richmond's own recent political history underscores the facile nature of the majority's assumption that elected officials' voting decisions are based on the color of their skins. In recent years, white and black councilmembers in Richmond have increasingly joined hands on controversial matters. When the Richmond City Council elected a black man mayor in 1982, for example, his victory was won with the

support of the city council's four white members. Richmond Times-Dispatch, July 2, 1982, p. 1, col. 1. The vote on the set-aside plan a year later also was not purely along racial lines. Of the four white councilmembers, one voted for the measure and another abstained. App. 49. The majority's view that remedial measures undertaken by municipalities with black leadership must face a stiffer test of Equal Protection Clause scrutiny than remedial measures undertaken by municipalities with white leadership implies a lack of political maturity on the part of this Nation's elected minority officials that is totally unwarranted. Such insulting judgments have no place in constitutional jurisprudence.

## C

Today's decision, finally, is particularly noteworthy for the daunting standard it imposes upon States and localities contemplating the use of race-conscious measures to eradicate the present effects of prior discrimination and prevent its perpetuation. The majority restricts the use of such measures to situations in which a State or locality can put forth "a prima facie case of a constitutional or statutory violation." *Ante*, at 500. In so doing, the majority calls into question the validity of the business set-asides which dozens of municipalities across this Nation have adopted on the authority of *Fullilove*.

Nothing in the Constitution or in the prior decisions of this Court supports limiting state authority to confront the effects of past discrimination to those situations in which a prima facie case of a constitutional or statutory violation can be made out. By its very terms, the majority's standard effectively cedes control of a large component of the content of that constitutional provision to Congress and to state legislatures. If an antecedent Virginia or Richmond law had defined as unlawful the award to nonminorities of an overwhelming share of a city's contracting dollars, for example, Richmond's subsequent set-aside initiative would then satisfy

the majority's standard. But without such a law, the initiative might not withstand constitutional scrutiny. The meaning of "equal protection of the laws" thus turns on the happenstance of whether a state or local body has previously defined illegal discrimination. Indeed, given that racially discriminatory cities may be the ones least likely to have tough antidiscrimination laws on their books, the majority's constitutional incorporation of state and local statutes has the perverse effect of inhibiting those States or localities with the worst records of official racism from taking remedial action.

Similar flaws would inhere in the majority's standard even if it incorporated only federal antidiscrimination statutes. If Congress tomorrow dramatically expanded Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* — or alternatively, if it repealed that legislation altogether — the meaning of equal protection would change precipitately along with it. Whatever the Framers of the Fourteenth Amendment had in mind in 1868, it certainly was not that the content of their Amendment would turn on the amendments to or the evolving interpretations of a federal statute passed nearly a century later.[12]

---

[12] Although the majority purports to "adher[e] to the standard of review employed in *Wygant*," *ante*, at 494, the "prima facie case" standard it adopts marks an implicit rejection of the more generally framed "strong basis in evidence" test endorsed by the *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267 (1986) plurality, and the similar "firm basis" test endorsed by JUSTICE O'CONNOR in her separate concurrence in that case. See *id.*, at 289; *id.*, at 286. Under those tests, proving a prima facie violation of Title VII would appear to have been but one means of adducing sufficient proof to satisfy Equal Protection Clause analysis. See *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 632 (1987) (plurality opinion) (criticizing suggestion that race-conscious relief be conditioned on showing of a prima facie Title VII violation).

The rhetoric of today's majority opinion departs from *Wygant* in another significant respect. In *Wygant*, a majority of this Court rejected as unduly inhibiting and constitutionally unsupported a requirement that a municipality demonstrate that its remedial plan is designed only to benefit specific victims of discrimination. See 476 U. S., at 277–278; *id.*, at 286

To the degree that this parsimonious standard is grounded on a view that either § 1 or § 5 of the Fourteenth Amendment substantially disempowered States and localities from remedying past racial discrimination, *ante*, at 490–491, 504, the majority is seriously mistaken. With respect, first, to § 5, our precedents have never suggested that this provision—or, for that matter, its companion federal-empowerment provisions in the Thirteenth and Fifteenth Amendments—was meant to pre-empt or limit state police power to undertake race-conscious remedial measures. To the contrary, in *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966), we held that § 5 "is a *positive* grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.*, at 651 (emphasis added); see *id.*, at 653–656; *South Carolina* v. *Katzenbach*, 383 U. S. 301, 326–327 (1966) (interpreting similar provision of the Fifteenth Amendment to empower Congress to "implemen[t] the rights created" by its passage); see also *City of Rome* v.

---

(O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 305 (MARSHALL, J., dissenting). JUSTICE O'CONNOR noted the Court's general agreement that a "remedial purpose need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required. . . . [A] plan need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently 'narrowly tailored,' or 'substantially related,' to the correction of prior discrimination by the state actor." *Id.*, at 286–287. The majority's opinion today, however, hints that a "specific victims" proof requirement might be appropriate in equal protection cases. See, *e. g.*, *ante*, at 504 (States and localities "must identify that discrimination . . . with some specificity"). Given that just three Terms ago this Court rejected the "specific victims" idea as untenable, I believe these references—and the majority's cryptic "identified discrimination" requirement—cannot be read to require States and localities to make such highly particularized showings. Rather, I take the majority's standard of "identified discrimination" merely to require some quantum of proof of discrimination within a given jurisdiction that exceeds the proof which Richmond has put forth here.

*United States*, 446 U. S. 156, 173 (1980) (same). Indeed, we have held that Congress has this authority even where no constitutional violation has been found. See *Katzenbach* v. *Morgan, supra* (upholding Voting Rights Act provision nullifying state English literacy requirement we had previously upheld against Equal Protection Clause challenge). Certainly *Fullilove* did not view § 5 either as limiting the traditionally broad police powers of the States to fight discrimination, or as mandating a zero-sum game in which state power wanes as federal power waxes. On the contrary, the *Fullilove* plurality invoked § 5 only because it provided specific and certain authorization for the Federal Government's attempt to impose a race-conscious condition on the dispensation of federal funds by state and local grantees. See *Fullilove*, 448 U. S., at 476 (basing decision on § 5 because "[i]n certain contexts, there are limitations on the reach of the Commerce Power").

As for § 1, it is too late in the day to assert seriously that the Equal Protection Clause prohibits States—or for that matter, the Federal Government, to whom the equal protection guarantee has largely been applied, see *Bolling* v. *Sharpe*, 347 U. S. 497 (1954)—from enacting race-conscious remedies. Our cases in the areas of school desegregation, voting rights, and affirmative action have demonstrated time and again that race is constitutionally germane, precisely because race remains dismayingly relevant in American life.

In adopting its prima facie standard for States and localities, the majority closes its eyes to this constitutional history and social reality. So, too, does JUSTICE SCALIA. He would further limit consideration of race to those cases in which States find it "necessary to eliminate their own maintenance of a system of unlawful racial classification"—a "distinction" which, he states, "explains our school desegregation cases." *Ante*, at 524 (SCALIA, J., concurring in judgment). But this Court's remedy-stage school desegregation decisions cannot so conveniently be cordoned off. These decisions (like those involving voting rights and affirmative action)

stand for the same broad principles of equal protection which Richmond seeks to vindicate in this case: all persons have equal worth, and it is permissible, given a sufficient factual predicate and appropriate tailoring, for government to take account of race to eradicate the present effects of race-based subjugation denying that basic equality. JUSTICE SCALIA's artful distinction allows him to avoid having to repudiate "our school desegregation cases," *ibid.*, but, like the arbitrary limitation on race-conscious relief adopted by the majority, his approach "would freeze the status quo that is the very target" of the remedial actions of States and localities. *McDaniel* v. *Barresi*, 402 U. S., at 41; see also *North Carolina Bd. of Education* v. *Swann*, 402 U. S., at 46 (striking down State's flat prohibition on assignment of pupils on basis of race as impeding an "effective remedy"); *United Jewish Organizations* v. *Carey*, 430 U. S. 144, 159–162 (1977) (upholding New York's use of racial criteria in drawing district lines so as to comply with § 5 of the Voting Rights Act).

The fact is that Congress' concern in passing the Reconstruction Amendments, and particularly their congressional authorization provisions, was that States would *not* adequately respond to racial violence or discrimination against newly freed slaves. To interpret any aspect of these Amendments as proscribing state remedial responses to these very problems turns the Amendments on their heads. As four Justices, of whom I was one, stated in *University of California Regents* v. *Bakke:*

> "[There is] no reason to conclude that the States cannot voluntarily accomplish under § 1 of the Fourteenth Amendment what Congress under § 5 of the Fourteenth Amendment validly may authorize or compel either the States or private persons to do. A contrary position would conflict with the traditional understanding recognizing the competence of the States to initiate measures consistent with federal policy in the absence of congressional pre-emption of the subject matter. *Nothing*

> *whatever in the legislative history of either the Four-*
> *teenth Amendment or the Civil Rights Acts even re-*
> *motely suggests that the States are foreclosed from fur-*
> *thering the fundamental purpose of equal opportunity to*
> *which the Amendment and those Acts are addressed.*
> Indeed, voluntary initiatives by the States to achieve the
> national goal of equal opportunity have been recognized
> to be essential to its attainment. 'To use the Four-
> teenth Amendment as a sword against such State power
> would stultify that Amendment.' *Railway Mail Assn.*
> v. *Corsi*, 326 U. S. 88, 98 (Frankfurter, J., concurring)."
> 438 U. S., at 368 (footnote omitted; emphasis added).

In short, there is simply no credible evidence that the
Framers of the Fourteenth Amendment sought "to transfer
the security and protection of all the civil rights . . . from the
States to the Federal government." The *Slaughter-House
Cases*, 16 Wall. 36, 77–78 (1873).[13] The three Reconstruction
Amendments undeniably "worked a dramatic change in the
balance between congressional and state power," *ante*, at
490: they forbade state-sanctioned slavery, forbade the state-
sanctioned denial of the right to vote, and (until the content
of the Equal Protection Clause was substantially applied to
the Federal Government through the Due Process Clause of
the Fifth Amendment) uniquely forbade States to deny
equal protection. The Amendments also specifically empow-
ered the Federal Government to combat discrimination at a
time when the breadth of federal power under the Constitu-
tion was less apparent than it is today. But nothing in the
Amendments themselves, or in our long history of interpret-
ing or applying those momentous charters, suggests that

[13] Tellingly, the sole support the majority offers for its view that the
Framers of the Fourteenth Amendment intended such a result are two law
review articles analyzing this Court's recent affirmative-action decisions,
and a Court of Appeals decision which relies upon statements by James
Madison. *Ante*, at 491. Madison, of course, had been dead for 32 years
when the Fourteenth Amendment was enacted.

States, exercising their police power, are in any way constitutionally inhibited from working alongside the Federal Government in the fight against discrimination and its effects.

## IV

The majority today sounds a full-scale retreat from the Court's longstanding solicitude to race-conscious remedial efforts "directed toward deliverance of the century-old promise of equality of economic opportunity." *Fullilove*, 448 U. S., at 463. The new and restrictive tests it applies scuttle one city's effort to surmount its discriminatory past, and imperil those of dozens more localities. I, however, profoundly disagree with the cramped vision of the Equal Protection Clause which the majority offers today and with its application of that vision to Richmond, Virginia's, laudable set-aside plan. The battle against pernicious racial discrimination or its effects is nowhere near won. I must dissent.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, dissenting.

I join JUSTICE MARSHALL's perceptive and incisive opinion revealing great sensitivity toward those who have suffered the pains of economic discrimination in the construction trades for so long.

I never thought that I would live to see the day when the city of Richmond, Virginia, the cradle of the Old Confederacy, sought on its own, within a narrow confine, to lessen the stark impact of persistent discrimination. But Richmond, to its great credit, acted. Yet this Court, the supposed bastion of equality, strikes down Richmond's efforts as though discrimination had never existed or was not demonstrated in this particular litigation. JUSTICE MARSHALL convincingly discloses the fallacy and the shallowness of that approach. History is irrefutable, even though one might sympathize with those who—though possibly innocent in themselves— benefit from the wrongs of past decades.

So the Court today regresses.   I am confident, however, that, given time, it one day again will do its best to fulfill the great promises of the Constitution's Preamble and of the guarantees embodied in the Bill of Rights — a fulfillment that would make this Nation very special.